**In re JACK GREENBERG, INC., Debtor.**

**Larry Waslow, Trustee for Jack Greenberg, Inc., Plaintiff,**

**v.**

**Grant Thornton LLP, Defendant.**

**Bankruptcy No. 95–13891DWS. Adversary No. 97–0068.**

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Oct. 5, 1999.

Walter Weir, Weir & Partners, Philadelphia, PA, for trustee/plaintiff.

Arlene Fickler, Hoyle, Morris & Kerr, Philadelphia, PA, for defendant.

Dave Adams, Philadelphia, PA, United States Trustee.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the motion ("Motion") of Defendant Grant Thornton, L.L.P. ("Grant Thornton") for summary judgment of the claims set forth in Counts II, III, IV and V of the Amended Complaint ("Amended Complaint") for "negligence," "fraud," "negligent misrepresentation" and "aiding and abetting fraud," respectively. A hearing on the Motion was held and the parties have submitted post-hearing briefs. The matter is now ripe for decision. Upon consideration and for the reasons stated below, I grant the Motion in part and deny it in part.

## BACKGROUND

### A. *The Debtor*

Plaintiff, Larry Waslow (the "Trustee"), is the Chapter 7 Trustee for the Debtor, Jack Greenberg, Inc. ("Debtor"). Amended Complaint ¶ 1.[1] The Debtor is a corporation whose business was the wholesale and retail sale of domestic and foreign meat and cheese products. *Id.* ¶ 3. The President and Vice President of the Debtor were Emanuel Greenberg ("Emanuel") and Fred Greenberg ("Fred"), respectively. *Id.* ¶ 6. Emanuel and his family own fifty percent of the stock while Fred and his family own the other fifty percent. Deposition of Fred, dated Nov. 13, 1998 (hereinafter referred to as "Fred Dep.") at 15; Deposition of Emanuel dated December 8, 1998 (hereinafter referred to as "Emanuel Dep.") at 76.[2] While the business was operating, Fred and Emanuel, together with their mother,[3] were also the directors of the company. *Id.* at 41.

In 1986 or 1987, Steve Cohn ("Cohn"), was hired by Debtor as its controller. Deposition of Cohn dated January 19, 1999 (hereinafter referred to as "Cohn Dep.") at 11.[4] He held that position until sometime in 1995 when his title was changed to Chief Financial Officer. *Id.* at 12. As the company's controller, Cohn "was responsible for the accounting area of the company, including the payables, receivables, payroll." *Id.* at 17–18. In this role, he also prepared monthly financial statements. *Id.* at 23. In addition, he was in charge of the data processing area and was involved in administrative matters with the banks with which the Debtor dealt.[5] *Id.* at 18.

### B. *Debtor's Credit Facilities*

In the early 1990's, Debtor had credit facilities with three banks, namely Meridi-

---

1. The paragraphs of the Amended Complaint cited herein were admitted by Grant Thornton in its answer to the Amended Complaint.

2. The entire transcripts, including exhibits, for the depositions of Fred and Emanuel are attached as Exhibits A and C to the Motion. Exhibits A through M of the Motion are contained in a three volume appendix to the Motion.

3. At some point in time before 1995, Fred's mother resigned from her position as director. Fred Dep. at 41.

4. The entire transcript, including exhibits, for Cohn's deposition is attached as Exhibit B to the Motion.

5. Emanuel testified as follows regarding Cohn's job responsibilities:
   Q. What were Mr. Cohn's job responsibilities when he was hired?

an Bank, Philadelphia National Bank and First Fidelity Bank (hereinafter referred to collectively as the "Banks"). Amended Complaint at ¶ 16. As a condition to one or more of these credit facilities, Debtor was required to limit the aggregate amount of its borrowing from the Banks. Cohn Dep. at 97–98. During the period in question, the aggregate amount varied from $10,000,000 to $15,000,000. *Id.* at 98–99. Emanuel, Fred and Cohn were each aware of the Debtor's aggregate borrowing limits. *Id.* at 106; Fred at 30–34. While Fred was not aware at any time that Debtor had exceeded its aggregate borrowing limit with the Banks, Emanuel was aware on a daily basis of the amount of money which Debtor had borrowed from its lenders. *Id.* at 188; Emanuel Dep. at 78. On a monthly basis, Cohn completed certifications which he sent to at least one of the Banks stating the aggregate amount of the Debtor's borrowings. Cohn Dep. at 105–106.

### C. *Prepaid Inventory and Fred's Fraudulent Conduct*

As part of its business, Debtor would purchase frozen meat from overseas. Be- cause the overseas vendors required pre- payment in advance of delivery, Debtor would pay for these products prior to its receipt of them. Debtor recorded these prepaid products as "prepaid inventory" on its balance sheets. Emanuel Dep. at 35– 36; Cohn Dep. at 13–14. Pursuant to Debtor's accounting policy, after an item of "prepaid inventory" was "received" by Debtor, it was supposed to be reclassified as "merchandise inventory" on the balance sheet.[6] Fred Dep. at 51–52; Cohn Dep. at 13–14. Debtor deemed an item to have been received after it was delivered to Debtor's warehouse and inspected by the United States Department of Agriculture. Fred Dep. at 51; Emanuel Dep. at 36–37.

Until the fall of 1994,[7] Fred was in charge of the Company's prepaid inventory of frozen meat.[8] Emanuel Dep. at 31–32; Cohn Dep. at 22–23, 73 (Fred assumed sole responsibility for the imported frozen beef portion of the business); Amended Complaint at ¶ 10. He ordered the vast majority of this product for the company. Fred Dep. at 46. Generally, Fred would place an order with a vendor. *Id.* at 47. Then, the meat would be inspected over-

A. He was the controller.

Q. What did that entail?

A. Preparing financial statements. Responsible for controls, internal controls. Chief financial officer.

Q. What was the condition of the internal controls when Mr. Cohn came on board?

A. I would say they were sloppy and I think he made great strides in correcting that.

Q. What did he do?

A. Well, he instituted different policies about the girls who ran the cash boxes, how they would check out, and I think there were procedures that he organized in the office amongst the office people. He got as much as he could onto the computer. He was generating statements on the computer. And he basically took control of everything that he could. The only thing he couldn't control was the prepaids.

Q. Was that because Fred wouldn't let him?

A. Fred wouldn't let him.

Emanuel Dep. at 121–22.

6. According to Fred, "prepaid inventory" was inventory for which the company had paid but which had not yet been received at the company's warehouse while "merchandise inventory" was inventory located at the company's warehouse. Fred Dep. at 44.

7. Fred resigned from his position as Vice President of the Debtor in the fall of 1994 immediately after admitting that he had falsified the company's prepaid inventory records as described *infra* at 498. Emanuel Dep. at 80.

8. Apparently, Debtor also prepaid for hams ordered from United Canners in order to obtain a two percent discount. Emanuel Dep. at 34–35, 50, 59–61, 84–85. For a period of time, Fred was the only one ordering these hams, but beginning in the summer of 1993, Emanuel also began ordering the hams. *Id.* Fred falsified some of the receiving records for hams which Emanuel ordered. *Id.* at 64–66.

seas by the applicable authority, loaded into refrigerated containers and placed on a boat. *Id.* at 47–49. While the shipment was underway, notice of it would be given to Debtor and Debtor would prepay for the meat. *Id.* at 49–50. When the shipment reached a port in the United States, a custom broker, John A. Steer, Inc. ("John Steer"), would arrange for entry with United States custom officials. *Id.* at 50. Thereafter, John Steer would send notice of the delivery to Debtor. *Id.* at 51. The shipment would subsequently be delivered to the Debtor's warehouse, opened up and inspected by an inspector from the United States Department of Agriculture ("USDA"). *Id.* at 51. For each shipment that passed inspection, the inspector completed a form, namely Form 9540–1. Burns Dep. at 98, 105. This form showed the date upon which the shipment had arrived in Debtor's warehouse. *Id.* After a shipment passed inspection, it was received into inventory. Fred Dep. at 51. Debtor's warehouse manager, Chuck McCloskey, was responsible for overseeing the inventory count when it arrived at the warehouse, stamping the meat after it was inspected and signing off on a document ("Delivery Receipt") which identified the date of arrival, the vendor, the product and the total number of boxes received. Cohn Dep. at 32–35, 48; Emanuel Dep. at 20–21. This Delivery Receipt would then be attached to the shipping document from the vendor. *Id.* at 35. Fred had sole responsibility for matching up the Delivery Receipt to the invoices and providing these documents to Cohn so that he could enter the inventory as received as of the date listed on the Delivery Receipt. Fred Dep. at 58–59, 134 (Fred was the only one at the company assigned the responsibility of providing Cohn with the receiving dates of prepaid inventory), 136 (from 1990 through 1994, Fred was the only person responsible for "assembling the documentation on prepaid inventory"); Emanuel Dep. at 32–34 ("Fred matched up the receiving invoices, and when he—when the product was received, he matched them up and turned them in to Steve [Cohn] to be recorded."). However, beginning sometime in 1987 or 1988, Fred began discarding the Delivery Receipts which he received from the warehouse manager and substituting new receipts. *Id.* at 86. On the new receipt, he forged the warehouse manager's initials and recorded an incorrect receiving date to make it appear as though the inventory was received by the Debtor at a later date than it was actually received. Fred Dep. at 70–71, 80. He provided this false information to Cohn. *Id.* at 81. Cohn used the false information in preparing the company's prepaid inventory log for the company's financial statements. *Id.* at 81; Emanuel Dep. at 91. Because of this, the financial statements overstated the amount of prepaid inventory, and misstated the company's net income and the cost of goods sold. *Id.* at 84–85.

Fred manipulated the dates upon which the prepaid inventory was received in order to make it appear that the company's operations generated the same general financial performance from period to period. *Id.* at 88. He did this by determining how much inventory needed to be prepaid inventory so that the percentages of gross profit and net income would remain consistent.[9] *Id.* at 88–89. *See also* Emanuel Dep.

9. When asked to explain his reasons for falsifying the Delivery Receipts, Fred testified as follows:

    A. In the early 1980's, Grant Thornton discovered accounting errors in the area of approximately $4 million which we were never able to find. It had to do with, I believe, the accounts payable and the general ledger. At that point, the company was starting to lose money. My father was still alive, he was ill.

And in order to avoid aggravating his illness, I started the practice so he would feel better about his business.

    Q. And your desire, though, was to perpetuate the family business even after his death?

    A. Yes.

    Q. And pass it on to your son?

    A. Yes.

    Q. And was there a general problem with the market in the early 1990s?

at 52 (Fred falsified "the amounts of the prepaids to increase the earnings statement.").

### D. *Grant Thornton, its Audits and the Discovery of Fred's Fraud*

Grant Thornton, a public accounting firm, provided accounting and auditing services to Debtor from 1986 through 1994. Amended Complaint ¶ 5. For each of its audits, Debtor and Grant Thornton entered into a letter agreement which set forth the terms of Grant Thornton's engagement. Fred Dep. at 134–35 & Exhibits. 16 and 23 thereto; Cohn Dep. at 51–52. In connection with each audit, Grant Thornton also required Fred and Emanuel to make written representations to it on behalf of the Debtor. Cohn Dep. at 69–70. *Id.*

To facilitate each of its audits, Grant Thornton provided Cohn with an "Engagement Compliance Checklist" identifying the information which was needed for the audit. Cohn Dep. at 52–56. Cohn would assemble the requested information and provide it to the auditors. *Id.* One of the items listed on the aforementioned checklist was "[d]etail listing of invoices comprising prepaid inventory, invoices and receiving reports on the list."[10] *Id.* at 55–56. For each audit, Fred provided Cohn with a package of documents to satisfy this

item on the checklist and Cohn provided the package to Grant Thornton. *Id.* at 55–58; Emanuel Dep. at 86–87, 92. The package included government forms, bills of lading, insurance information and the Delivery Receipts purportedly prepared by the warehouse personnel evidencing the date upon which the inventory was received at the Debtor's warehouse. Fred Dep. at 86–87; Cohn Dep. at 56; Deposition of David Burns dated January 18, 1999 (hereinafter referred to as "Burns Dep."), at 67–68, 73, 98;[11] Deposition of Eric Nagle dated January 22, 1999 (hereinafter referred to as "Nagle Dep."), at 21–22.[12] Importantly, the package did not include the form, namely Form 9540–1, which the inspector from the USDA completed when he inspected a shipment. Burns Dep. at 180. This form provided an independent means of verifying the date upon which a shipment of prepaid inventory was received in Debtor's warehouse. Cohn Dep. at 132; Fred Dep. at 95. While Grant Thornton was aware that these forms existed as early as 1988, it did not discover that Debtor had access to them until its audit in 1993. Burns Dep. at 159, 162–63, 167.

In addition to the aforementioned package of information which Fred compiled, Cohn would also provide Grant Thornton

---

A. The market changed. There were significant changes occurring in the market which adversely affected us.
Q. What were those?
A. Our types of customers were changing. Independents, which we specialized in, small independents, were going out of business and larger, big companies were coming in, which in order to sell, we had to sell at reduced margins.
Q. And your hope was that that would turn around at some point in time?
A. Yes.

Fred Dep. at 132–133. When asked whether his conduct also enabled him to keep his job because it made the company look good, Fred responded: "Keep a job? I never thought about it, really." *Id.* at 188–89.

**10.** Except for the requested information on the Debtor's prepaid inventory, Cohn accumulated all of the information on the checklist in a timely manner and provided it to Grant Thornton before the commencement of its audit. Deposition of Joseph Barker, dated January 20, 1999 ("Barker Dep.") at 46 [excerpts from Barker's Deposition are attached as Exhibit F to the Motion and as Exhibit A to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Trustee's Mem.")]. However, with regard to the information on prepaid inventory, Fred was always late in providing this information to Cohn so Grant Thornton always received it "a couple of days into the audit." *Id.*

**11.** Excerpts from Burns' deposition are attached as Exhibit G to the Motion and as Exhibit B to the Trustee's Mem.

**12.** Excerpts from the Nagle deposition are attached as Exhibit E to Trustee's Mem.

with a computer generated "Prepaid Inventory Log" to show the items for which Debtor had paid but had not received. Cohn Dep. at 59–66. The information on this log was based on the fraudulent receiving dates provided by Fred. Fred Dep. at 80–85.

In performing its audits, Grant Thornton tested 100% of the prepaid inventory transactions which meant that Grant Thornton examined every invoice for prepaid inventory and reviewed the Delivery Receipts to confirm if and when a delivery had been made. Barker Dep. at 54, 95, 97–98. The sole document upon which Grant Thornton relied in determining whether and, if so, when a shipment of prepaid inventory had been received at Debtor's warehouse was the Delivery Receipt which, as disclosed above, was an internally generated document. Burns Dep. at 106, 108, 132 (Grant Thornton used the "receiving ticket generated by the segregated receiving department to verify" the accuracy of the dates on which inventory was received.). Grant Thornton believed that it was acceptable to rely on the Delivery Receipt to verify the date of delivery because Debtor's internal control procedures for inventory were based on a system of "segregation of duties." *Id.* at 105–106, 133. Asked to explain what this meant, one of Grant Thornton's employees testified:

A. The warehouse would receive the information or would receive the merchandise independent of the accounting department and independent of the accounts payable department.

Q. When you say "independent of," what do you mean specifically?

A. They are receiving it with no interference from another department. They are signing a delivery receipt and then just forwarding that document on.

Q. Do you mean to say that there are different people in those departments that are segregated, so there are actually different people performing these functions?

A. Yes.

Q. So there's no overlap in the function?

A. No.

Barker Dep. at 12–13.[13] In basing its auditing procedures for Debtor's inventory on Debtor's "segregation of duties," Grant Thornton was operating under the belief that there was no difference between the procedures which Debtor utilized for handling shipments of domestic meat and imported meat which was not the case.[14] Barker Dep. at 40; Cohen Dep. at 36, 153–154; 174–175. After delivery of a shipment of domestic meat, the invoice was placed in a "metal box" where it was kept until submitted for payment to the Accounts Payable Department. Cohn Dep. at 153–54; 174–75. For shipments of imported meat, the invoices were not placed in the box since they had already been paid and, therefore, were not sent to the Accounts Payable Department. *Id.*

---

**13.** Eric Nagle was also asked to explain the phrase "segregation of duties":

    Q. You speak of segregation of duties. What do you mean by that?

    A. Somebody is separate—you know, the purchasing function is separate from the receiving function and the approval function is different from the person who executes the transactions.

    Q. Does that mean that there are separate people that do these different functions?

    A. Yes. Separate people or departments.

Nagle Dep. at 15.

**14.** In opposition to the Motion, the Trustee submitted an expert report ("Trustee's Expert Report") by Philip J. Santarelli, CPA ("Santarelli"), of Parente, Randolph, Orlando, Carey & Associates which opines that Grant Thornton's audits did not comply with Generally Accepted Accounting Principles and Generally Accepted Auditing Standards. *See* Exhibit G to Trustee's Mem. In support of his conclusion, Santarelli expands on Grant Thornton's failure to understand the internal procedures which applied to Debtor's prepaid inventory business. *See* Exhibit G to Trustee's Mem. at 6–12.

Whether Grant Thornton would have altered its audit procedures *vis-a-vis* the Debtor's pre-paid inventory if it had been aware of this distinction is unclear.

At the conclusion of each audit during years 1990–1993, Grant Thornton issued a report entitled "Internal Control Structure Reportable Conditions and Advisory Comments."[15] *See* Exhibits I (1990, 1991 and 1992 reports) & J (1993 report) to Trustee's Mem.; Fred Dep. Exhibits 25 (1991 report) & 26 (1992 report). This report contained recommendations for improving the Debtor's internal control structure. *Id.* With regard to prepaid inventory, the language in the 1990, 1991 and 1992 reports is almost identical. It consists of one paragraph which is included within the section labeled "Inventory." The 1992 report states:

> Prepaid inventory is manually reconciled monthly, approximately 60 to 90 days after month-end.[16] The amount of prepaid inventory has increased from approximately $2,474,000 in 1989 to $7,492,000 in 1992.[17] Each item within this category represents a significant amount. Prepaid inventory should be set up on a personal computer and updated daily from purchases. This would identify a problem much sooner and reduce the risk of loss should such a problem occur.

Fred. Dep. Exhibit 26 (footnotes added). While Cohn and Emanuel agreed that it would be beneficial to the Debtor to record the company's information regarding prepaid inventory on a computer, Fred refused to implement this suggestion. When questioned on this matter, Cohn testified as follows:

**Q.** There's a recommendation in the third paragraph of the last sentence [on the second page of the Internal Control Structure Reportable Conditions and Advisory Comments report dated June 28, 1991] that prepaid inventory should be set up on a personal computer and updated daily for payments and receipts; do you see that?

**A.** Yes.

**Q.** Was that something that you agreed with?

**A.** Yes.

**Q.** Do you recall discussing that recommendation with Mr. Fred Greenberg?

**A.** Yes.

**Q.** What about Manny Greenberg?

**A.** Yes.

**Q.** And was the recommendation implemented in 1991 or at any time after that until 1995?

\* \* \*

**A.** What I am thinking this meant was to actually—that this was my suggestion—that we should put it on the computer and show from receiving all the way through to receipt. That was my suggestion.

By May of 1992, I had actually created this sheet and I presented this sheet to Fred directly, who was sitting here. And Manny who sat right next to him right here was there to listen.

I told Fred how this was a great idea and how I believed that this would be a big step forward in being

---

**15.** Cohn testified that he assisted Grant Thornton in drafting these reports by reviewing them in draft form and providing comments thereon. Cohn Dep. at 71. Cohn viewed the reports as a "way to alert Manny [referring to Emanuel] and Fred that there were problems." *Id.*

**16.** The 1991 report states: "Prepaid inventory is manually reconciled monthly, approximate-

ly 45 to 60 days after month-end." Exhibit I to Trustee's Mem.

**17.** The 1990 report states that "[t]he amount of prepaid inventory has increased from $2,473,556 in 1989 to $5,532,852 in 1990." Exhibit I. to Trustee's Mem. The 1991 report states that "[t]he amount of prepaid inventory has increased from $5,532,352 in 1990 to $6,482,610 in 1991." *Id.*

able to monitor the inventory and determine what was open.

Up until this point, it was on some scribble that Fred maintained, on a note pad.

I had presented it to him. I had a whole format and it would maintain prices and I created so we could show margin and I was actually very proud of what I had put together.

And I showed it to Fred, looked at it and I said isn't this great? We can do this? And I needed help because he needed to give me the information. And I said don't you want me to do this? And he looked up at me and said no.

I was flabbergasted. I looked over to Manny. He just sat there. And I was furious. . . . I didn't talk to Fred for weeks. I was—I was having a hard time dealing with it. I couldn't imagine why he wouldn't want me to do this. It was such a good thing for the company. And he didn't want me to do it.

I then tried to do it on my own without his help. And we used to run back and forth trying to get these receivings [referring to the Delivery Receipts] that Chuck was preparing and it became a game. I became a laughing stock because it was a joke that I was trying to get this information.

You could see from my desk, you could see the window when these trucks were coming in. I used to run out to the warehouse. I used to try and make copies and actually as this was going on, I was coming very close to discovering what was going on back in '92.

It became so frustrating, I threw my arms up, probably only weeks before I could have discovered what was going on and said I'm not going to play this game with you anymore and little did I know at the time that here was something going on. It probably would have been blown out of the water right at that time.

Q. Did [Emanuel] do anything to force Fred to implement the recommendations as outlined in Exhibit 25 [referring to the Internal Control Structure Reportable Conditions and Advisory Comments report for June 28, 1991] or the recommendations that you presented at the meeting you described?

A. Manny would turn to Fred. They would probably argue and Manny would say, Fred, it would be good for the company. Fred, you know, come on. It would be better, you know, Fred—he would never take that as a stand that he needed to take. He needed to say, do you know what? You don't like it. Screw you. We're doing it.

And that actually happened with the hams; after we threw out a ton of hams.

\* \* \*

Q. Okay.

A. But he never got involved in the meat.

Cohn Dep. at 72–77.

During the course of its audit in 1993, Grant Thornton noticed that the time periods between the arrival dates noted on the forms which Debtor's custom broker, John Steer, prepared when a shipment arrived in the United States and the arrival dates recorded on the Delivery Receipts at Debtor's warehouse were getting longer. Barker Dep. at 86–88, 94–95. When Grant Thornton raised this issue with Fred, he attributed the lengthening time period to "floods in the Midwest" which caused a delay in "getting some of the inventory from the West Coast to the East Coasts." *Id.* at 88. Grant Thornton verified Fred's explanation by contacting John Steer. *Id.* Thereafter, Grant Thornton continued to use the same method of auditing Debtor's prepaid inventory, relying upon its conclu-

sion that the procedures it was utilizing "more than covered the GAAS requirements." *Id.*

Near the end of its audit in 1993, Grant Thornton discovered that Debtor had access to the UDSA Forms 9540–1. Burns Dep. at 157, 168, 180; Cohn Dep. at 131–32. The discovery was made when one of Grant Thornton's employees happened to open a drawer in the receiving clerk's office in the warehouse and found a stack of these forms in no numerical sequence and order. Burns Dep. at 157, 162, 168, 180. While an attempt was made to match these forms with the Delivery Receipts so that the dates listed on the Delivery Receipts could be verified, the task proved insurmountable and was abandoned. *Id.* at 180; Cohn at 131–32. Grant Thornton was also advised that many of the forms had been thrown out. Barker Dep. at 99. Grant Thornton did not attempt to obtain copies of the forms for its 1993 audit because its audit procedures for that year did not require them. *Id. See also* Burns Dep. at 162–63, 167 (based on Grant Thornton's understanding of how Debtor ran its business, Grant Thornton was satisfied with its 1993 audit procedure of using the Delivery Receipt to determine when inventory was received and did not find it necessary to obtain copies of the utilize the USDA forms). However, Grant Thornton decided that since the Debtor had access to the forms, it wanted them produced for the 1994 audit so that it could use them to verify the date recorded on the Delivery Receipts. Barker Dep. at 98–99; Burns Dep. at 162–63.

Deviating from past years, Grant Thornton changed the Internal Control Structure Reportable Conditions and Advisory Comments which it issued in connection with its 1993 audit to include a new section focusing exclusively on prepaid inventory. This new section provided, in pertinent part:

Prepaid Purchases (New in 1993)

There is no formal policy for tracking and recording prepaid purchases. Documentation detailing the arrival of shipments form [sic] overseas and inspection by the USDA is not retained by the Company. Since prepaid purchases represent a significant amount, approximately 40% of total assets and 60% of total inventory, detailed records should be maintained by the Company.

For each individual prepaid purchase, the Company should have:

\* \* \*

- FSIS Form 9540–1 [18] with the vessel name, container number, transportation company, arrival date, consignor, custom entry number and country of origin. This form should be signed and dated by the FSIS official and by the inspector.

\* \* \*

- Copy of the daily receiving log from the dock. This log should include the container number, transportation company, dated received, product description and weight (pounds and cartons). This log should be initialed by the employee receiving the shipment.

Additionally, a prepaid purchase control sheet should be maintained by the controller. This control sheet should detail the purchase order number and date, date paid, vendor, invoice number, date and amount, product description and weight, shipment vessel, container marks, date arrived in count[r]y, date arrived at Company or warehouse and date inspected.

Examples of a control log and receiving report can be found on Exhibits A and B.

Exhibit J to Trustee's Mem; Fred Dep. Exhibit 20. Prior to this report, Grant Thornton had never recommended that Debtor, nor required Debtor to, retain the

---

**18.** The FSIS Form 9540–1 is the form which the USDA inspector completed when he inspected shipments of inventory arriving at Debtor's warehouse.

Form 9540–1 for its audit. Cohn Dep. at 130.

In response to questions regarding this new section on prepaid inventory in the Internal Control Structure Reportable Conditions and Advisory Comments report issued in conjunction with Grant Thornton's 1993 audit, Cohn testified as follows:

Q. Do you see a section in the letter [referring to the report on Internal Control Structure Reportable Conditions and Advisory Comments for July 2, 1993] that pertains to prepaid purchases?

A. Yes.

Q. What do you recall specifically, if anything, Mr. Cohn, about the genesis of this letter and its preparation by the accounting firm?

A. This specific comment came out because we were unable to, by a third party, determine the receiving of the prepaid inventory.

Q. And that's for the 1993 audit?

A. Yes, '93 audit.

Q. And by this specific comment, you are referring to the section entitled prepaid purchases, parenthesis, new in 1993, closed parens?

A. Yes.

Q. And GT3813?

A. That's correct.

Q. Okay.

A. This comment was put in here and I believe David Burns probably wrote this and it was so that Fred would be required—and this wasn't really as much of a comment as it became a requirement. They weren't suggesting this.

They were basically telling him this is what you need to do and they told him that we no longer are going by you're [sic] referring. We want the inspector, the third party to be attached to every prepaid invoice.

Q. Was [Emanuel] Greenberg advised of that requirement?

A. Yes. They both were. [Emanuel] had no problem with it whatsoever.

Q. You will notice that this comment refers to examples of a control log and receiving report attached as Exhibits A and B to this letter.

And if you look at Exhibit 20, Exhibit A is there . . . a frozen beef daily receipts log. Do you see that?

A. Yes.

Q. Do you recognize that form?

A. It's a form I created and I had asked Grant to put that into the letter because if I had this information, I would have been able to do my schedule. So, I was basically going through Grant to get what I thought we needed to make this thing work.

Cohn Dep. at 85–87.

During the course of the year leading to the 1994 audit, Fred did not comply with Grant Thornton's recommendation and/or directive regarding the USDA forms. *Id.* at 89. Cohn advised Grant Thornton of this fact; Grant Thornton held a meeting at which it advised Fred that it needed these forms for its 1994 audit. *Id.* at 89–91. Still Fred did not comply. *Id.* After commencing its 1994 audit, Grant Thornton was once again provided with a package of prepaid inventory documents which did not include the USDA forms. Burns Dep. at 175. Thereafter, a series of meetings was held discussing Grant Thornton's need for these forms and how to get access to them. *Id.* at 175. Eventually, Grant Thornton advised Fred that unless the forms were provided with the rest of the documentation, it would have to consider limiting the scope of its audit or resigning from the account. *Id.* at 176. In or about October of 1994, Fred provided the USDA forms to Grant Thornton. Fred Dep. at 95. However, before he did so, he altered the dates on them. *Id.* Apparently, the alteration was so obvious that after reviewing the forms for only ten seconds, Grant Thornton knew there was a problem.

Cohn Dep. at 92–94; 135–136. Grant Thornton informed Emanuel and Cohn that the dates were falsified and terminated the audit. *Id.* at 93–94; Emanuel Dep. at 14–15. When Emanuel confronted Fred about the falsified receiving dates, he admitted "everything." Emanuel Dep. at 52.[19]

Thereafter, Debtor, with Grant Thornton's assistance, began the process of attempting to determine the extent to which Fred's manipulation of the receiving dates had distorted and affected the Debtor's financial condition. Cohn Dep. at 94. After that determination was made, Emanuel and Fred, accompanied by Debtor's counsel, notified each of the Banks what had happened. *Id.* at 166. Debtor continued in business thereafter for approximately six months.

## E. *The Practice of Holding Checks*

Prior to and during the 1990's, checks were generated by Debtor to pay certain bills but, rather than being promptly mailed to the intended recipient, the checks would be held for two to four weeks. Fred Dep. at 138–39; Emanuel Dep. at 78–79; Cohn Dep. at 138. Fred was responsible for engaging in this practice; he testified that the purpose of the practice was to conserve money. Fred Dep. at 139. Emanuel tried to persuade Fred to stop holding checks, but Fred would not stop doing it. Emanuel Dep. at 79. When Grant Thornton conducted its audit, it would "run a tape of all the checks in the safe" and make an adjustment "back to cash" in its journal entry. Cohn at 138–140. Emanuel was aware that Grant Thornton was making these adjustments for the checks. When questioned on this topic, Emanuel testified:

Q. Did you understand that the practice of holding checks understated cash and accounts payable balances?

A. They were factored back in at the end of the year.

Q. How was that done?

A. They counted up the checks and they changed the accounts payable. The records were corrected at year end.

Q. In other words, some adjusting journal entries were made to accurately reflect—

A. What was paid and not paid.

Q. And you were aware that was being done?

A. Yes.

Emanuel Dep. at 88–89.

Grant Thornton disapproved of this practice of holding checks. In its Internal Control Structure Reportable Conditions and Advisory Comments reports for 1990, 1991, 1992 and 1993, Grant Thornton stated, in similar fashion:

Checks for payment of vendor invoices are prepared and signed, but not always mailed immediately. The disbursement is recorded when the check is produced, understating the cash and accounts payable balances. Held checks at June 29, 1990 amounted to approximately $2,559,-000.[20] Having checks held also increases the risk of theft, loss or error. Checks should be prepared only when they are to be mailed to properly reflect the company's financial position and to safeguard against loss.

Exhibits I and J to Trustee's Mem.

## F. *The Bankruptcy and Adversary Proceeding*

On May 19, 1995, an involuntary petition requesting an Order for Relief under

19. Testifying the Fred admitted falsifying the receiving dates, Emanuel stated:

He admitted it. He told me everything. He told me he started it and in his words, I think he used the phrase in the last year of my father's life is when he started doing it. And he thought he would be able to put it back the following year.

Emanuel Dep. at 52.

20. In 1991, this amount was $1,852,000; in 1992, it was $1,022,000; and in 1993, it was $840,000. *See* Exhibits I and J to Trustee's Mem.

Chapter 7 of the Bankruptcy Code was filed against the Debtor. On June 21, 1995, an Order for Relief was entered and the case was voluntarily converted by the Debtor to a case under Chapter 11. Approximately one month later, on July 25, 1995, the case was reconverted to a case under Chapter 7. Thereafter, the Trustee was elected and his election was confirmed.

On February 5, 1997, the Trustee commenced this adversary proceeding against Grant Thornton by filing a complaint ("Complaint") containing eight counts. Grant Thornton filed a motion to dismiss Counts I through V of the Complaint which contained claims for breach of contract, negligence, fraud, negligent misrepresentation, and aiding and abetting, respectfully.[21] By Order dated August 6, 1997, I denied Grant Thornton's motion insofar as it sought the dismissal of Counts II and IV, but granted it with respect to Counts I, III and V. *See Waslow v. Grant Thornton, L.L.P. (In re Jack Greenberg, Inc.),* 212 B.R. 76 (Bankr.E.D.Pa.1997) (hereinafter referred to as *"Waslow I"*). Because I dismissed Counts III and V for failure to satisfy the pleading requirements of Rule 9(b),[22] I granted the Trustee an opportunity to file an amended pleading for these counts.

On September 5, 1997, the Trustee filed the Amended Complaint reasserting the same claims, but including additional allegations in support of Counts III and V. On September 18, 1997, Grant Thornton filed an answer to the Amended Complaint except for Counts III and V. With regard these two counts, for fraud and aiding and abetting fraud, respectively, Grant Thornton moved to have them dismissed for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). I denied the motion. *See Waslow v.*

*Thornton (In re Jack Greenberg, Inc.),* 1997 WL 860673 (Bankr.E.D.Pa. Dec. 12, 1997). Shortly thereafter, Grant Thornton filed an answer to Counts III and V of the Amended Complaint.

After conducting extensive discovery, Grant Thornton filed the instant Motion and accompanying memorandum of law. *See* Brief in Support of Grant Thornton's Motion for Summary Judgment ("Grant Thornton's Mem."). The Trustee subsequently filed his pre-hearing memorandum and Grant Thornton filed a reply. *See* Reply Brief in Support of Grant Thornton's Motion for Summary Judgment ("Grant Thornton's Reply"). A hearing was held on the Motion subsequent to which each of the parties submitted a post-hearing memorandum. *See* Plaintiff's Supplemental Memorandum of Law in Opposition to Summary Judgment Motion of Defendant, Grant Thornton LLP ("Trustee's Supp.Mem."); Supplemental Brief in Support of Grant Thornton's Motion for Summary Judgment ("Grant Thornton's Supp.Mem.").

## DISCUSSION

### I. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure governing summary judgment is made applicable in the bankruptcy court by Bankruptcy Rule 7056. Pursuant to Rule 56 summary judgment should be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). The Court's role in applying this rule is not to weigh the evidence but to determine only whether there is a disputed, material fact for determination at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106

---

**21.** The remaining three counts of the Complaint alleged claims under 11 U.S.C. § 547(b); 11 U.S.C. § 549; and 11 U.S.C. § 548(a)(2)(A).

**22.** Fed.R.Civ.P. 9(b) is made applicable hereto by Fed.R.Bankr.P. 7009.

S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All facts and inferences are construed in the light most favorable to the non-moving party. *Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998). To successfully oppose summary judgment, a nonmoving party may not rest on his pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 247–50, 106 S.Ct. at 2510–11. Such evidence must be sufficient to support a jury's factual determination in favor of the nonmoving party. *Id.*

## II. THE BASES OF THE MOTION

In support of its Motion, Grant Thornton raises the following three principal arguments:

(i) Summary judgment should be granted in its favor on Counts II, III, IV and V of the Amended Complaint because Fred's conduct must be imputed to the Debtor, precluding any suit by the Trustee who stands in the Debtor's shoes;

(ii) Summary judgment should be granted in its favor on Counts II and IV for negligence and negligent misrepresentation because there is no genuine issue of material fact that Debtor was contributory negligent and that it interfered with Grant Thornton's audit; and

(iii) Summary judgment should be granted in its favor on the Trustee's fraud claims in Counts III and V because the Trustee cannot establish by clear and convincing evidence several elements of these claims.

**23.** While the Trustee asserted this bright line rule in both his pre-hearing and post-hearing memoranda, at the hearing on the Motion, he retreated from this position, stating that he

Each of these arguments is examined below.

### A. *Imputation*

Grant Thornton contends that the Trustee's claims for professional negligence, fraud, negligent misrepresentation and aiding and abetting are barred because Fred's knowledge and wrongful conduct must be imputed to the Debtor. The Trustee disagrees, asserting three primary arguments. First, the Trustee contends that equitable defenses, including the defense of imputation, cannot be raised to bar a suit brought by a bankruptcy trustee.[23] Second, the Trustee argues that, even if the imputation defense is generally available in such suits, it should be held inapplicable here because the objectives of tort liability would not be served by barring his claims. Third, the Trustee asserts that there are disputed issues of material fact such as whether Fred was acting in the scope of his employment and whether his conduct was for the benefit of the Debtor, which preclude this Court from deciding, as a matter of law, that Fred's conduct should be imputed to Debtor.

If I find merit in the Trustee's arguments that equitable defenses are not applicable in suits by a bankruptcy trustee or that the imputation defense is inapplicable here because the objectives of tort liability would not be served by barring the Trustee's claims, then it will be unnecessary for me to determine whether this record supports a finding that, as a matter of law, Fred's conduct is imputable to the Debtor. Accordingly, I will begin my analysis with the former two issues.

1. *Whether Equitable Defenses can be Raised as a Bar in a Suit by a Bankruptcy Trustee*

■ Acknowledging the United States Supreme Court decision in *O'Melveny &*

was not suggesting that the imputation defense would never be applicable against a bankruptcy trustee.

*Myers v. FDIC,* 512 U.S. 79, 83–85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (state law governs the imputation of knowledge to corporate victims of alleged negligence), both parties recognize that whether the imputation defense can be raised in a suit against a bankruptcy trustee is a matter of state law.[24] *See* Trustee's Mem. at 11; Grant Thornton's Reply at 10. *See also Welt v. Sirmans,* 3 F.Supp.2d 1396, 1401 (S.D.Fla.1997) (recognizing that state law governs the issue of whether the fraud of a director should be imputed to the bankruptcy trustee of that corporation); *Gordon v. Basroon (In re Plaza Mortgage and Finance Corporation),* 187 B.R. 37, 47 (Bankr.N.D.Ga.1995) (concluding that state law governs application of equitable defense of imputation to bankruptcy trustee). Both parties also agree that no Pennsylvania cases have addressed this issue. *See* Trustee's Mem. at 11; Grant Thornton's Reply at 11.

The absence of state law does not allow me to adopt my view of the law; rather, I must predict how the Pennsylvania Supreme Court would rule if it were presented with the question. *Wiley v. State Farm Fire & Casualty Co.,* 995 F.2d 457, 459 (3d Cir.1993); *Milan v. American Vision Center,* 34 F.Supp.2d 279, 281 (E.D.Pa.1998). In attempting to forecast state law, I must consider the following:

(1) what the Pennsylvania Supreme Court and Pennsylvania intermediate courts have said in related areas,

(2) federal cases interpreting Pennsylvania law;

(3) decisions from other jurisdictions that have discussed the issue; and

(4) the policies underlying the applicable legal doctrines.

*Wiley v. State Farm Fire & Casualty Co., supra,* at 459–60 (*quoting Gruber v. Ow-*ens–Illinois Inc., 899 F.2d 1366, 1369–70 (3d Cir.1990)). *See also 2–J Corporation v. Tice,* 126 F.3d 539, 541 (3d Cir.1997) (*quoting Aloe Coal Co. v. Clark Equipment Co.,* 816 F.2d 110, 117 (3d Cir.1987), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987) (internal quotation marks omitted)) (in predicting how state's highest court would rule, federal court must consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.").

The Trustee contends that, in the absence of Pennsylvania cases on the issue, federal courts in Pennsylvania should rely on the analysis presented by the Ninth Circuit in *Federal Deposit Insurance Corporation v. O'Melveny & Myers,* 61 F.3d 17 (9th Cir.1995) (*"O'Melveny II"*), its predecessor case, *Federal Deposit Insurance Corporation v. O'Melveny & Meyers,* 969 F.2d 744 (9th Cir.1992) (*"O'Melveny I"*), *rev'd in part,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), and subsequent cases adopting its views. In *O'Melveny I,* the Federal Deposit Insurance Corporation ("FDIC"), as receiver for the failed savings and loan association American Diversified Savings Bank ("ADSB"), sued the law firm of O'Melveny & Meyers, alleging "professional negligence in connection with its legal advice and services to ADSB." 969 F.2d at 745–46. The law firm defended by arguing, *inter alia,* that the wrongdoing of ADSB's corporate officers could be attributed to the corporation and since the FDIC "stands in the shoes" of the corporation as its receiver, FDIC was estopped from making a claim against the law firm based on the corporate officers' wrongful conduct. *Id.* at 749, 751–52. The Ninth Circuit disagreed, holding that,

---

**24.** Although the parties acknowledged in their pre-hearing memoranda that Pennsylvania law controls, they failed to include any analysis in their memoranda of how the Pennsylvania Supreme Court would rule on whether the imputation and other equitable defenses can be raised in a suit by a bankruptcy trustee. At the hearing, I questioned the Trustee's counsel regarding this omission. At his suggestion, the parties were granted the opportunity to file post-hearing memoranda addressing the issue.

under federal law,[25] even assuming the wrongdoing of the corporate officers could be imputed to the corporation so that it would be estopped from bringing the lawsuit against the law firm, the bank's inequitable conduct could not be imputed to the FDIC. In so holding, the Ninth Circuit relied upon the "age-old principles" that "equity does equity" and that " '[e]quity will look through the form of the transaction, and adjust the equities of the parties with a view to its substance[.]' " 969 F.2d at 751 (*citing Van Rensselaer v. Kearney,* 52 U.S. 297, 11 How. 297, 13 L.Ed. 703 (1850) and *quoting Drexel v. Berney,* 122 U.S. 241, 7 S.Ct. 1200, 30 L.Ed. 1219 (1887)). With these maxims in mind, the Ninth Circuit reasoned as follows:

> A receiver, *like a bankruptcy trustee* and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects. This places the receiver in stark contrast to the normal successor in interest who voluntarily purchases a bank or its assets and can adjust the purchase price for the diminished value of the bank's assets due to their associated equitable defenses. In such cases, the bank receives less consideration for its assets because of its inequitable conduct, thus bearing the cost of its own wrong.
>
> Also significant is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value

of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets.

> In light of these considerations, we conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the bank should not be available against the receiver. To hold otherwise would be to elevate form over substance—something courts sitting in equity traditionally will not do. Of course, it does not necessarily follow that equitable defenses can never be asserted against FDIC acting as a receiver; we hold only that the bank's inequitable conduct is not imputed to FDIC.

969 F.2d at 751–52 (citations omitted) (emphasis added).

Notably, the United States Supreme Court disagreed with the Ninth Circuit's conclusion that federal law controlled whether the misconduct of ASDB's officers could be imputed to the FDIC as receiver, and remanded so that state law would be applied. *O'Melveny & Myers v. Federal Deposit Insurance Corporation,* 512 U.S. 79, 85–89, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Nevertheless, even analyzing the issue under state law, the Ninth Circuit reached the same conclusion. *See Federal Deposit Insurance Corporation v. O'Melveny & Myers,* 61 F.3d 17, 18–20 (1995). In its decision on remand, the Ninth Circuit stated:

> While we find it a closer question under state law than under federal law, we nevertheless conclude that the FDIC is not barred by certain equitable defenses O'Melveny could have raised against ASDB. We recognize that, in general, "[a] receiver occupies no better

---

**25.** In deciding whether the FDIC was subject to the equitable defenses that would be available in a suit against the law firm, the Ninth Circuit specifically stated that: "contrary to

O'Melveny's argument, we are not bound by state law, but must instead establish federal law." 969 F.2d at 751.

position than that which was occupied by the person or party for whom he acts ... and any defense good against the original party is good against the receiver." *Allen v. Ramsay,* 179 Cal.App.2d 843, 854, 4 Cal.Rptr. 575 (1960). However, this rule is subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver. *See Camerer v. California Sav. & Commercial Bank,* 4 Cal.2d 159, 170–71, 48 P.2d 39 (1935). While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law. Moreover, when a party is denied a defense under such circumstances, the opposing party enjoys a windfall. This is justifiable as against the wrongdoer himself, not against the wrongdoer's innocent creditors.

61 F.3d at 19. For the remainder of its opinion, the Ninth Circuit quoted verbatim the excerpt which I set forth above from its prior decision.[26]

**26.** The Seventh Circuit, applying Illinois law, appears to be of the same view as the Ninth Circuit. In *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995), the court found an exception to the rule that would have imputed the principal's wrongdoing to the corporation where a receiver had been appointed to maximize the value of the corporation for the benefit of investors and creditors, stating:

> Though injured by Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. The rule is that the maker of the fraudulent conveyance and all those in privity with him—which certainly includes the corporations—are bound by it. [citations omitted]. But the reason, of course, as the cases just cited make clear, is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes. [citations omitted]. That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets. The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims.
>
> Put differently, the defense of in pari delicto loses its sting when the person who is

in *pari delicto* is eliminated. [citations omitted].

*Id.* at 754. While at least one court has found *Scholes* inapplicable where the plaintiff is a bankruptcy trustee as opposed to a receiver, *see Hannover Corp. of America v. Beckner,* 211 B.R. 849 (M.D.La.1997), a more recent case from the Seventh Circuit, *Fisher v. Apostolou,* 155 F.3d 876 (7th Cir.1998) suggests that the outcome would be the same were the plaintiff a trustee. Discussing *Scholes,* the Seventh Circuit stated:

> We put to one side for the moment the question whether the trustee as representative of Collins' estate could recover anything, because the analysis would be different from the one applicable to Lake States, a corporate body. With respect to the corporation, our starting point is this court's decision in *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995). In *Scholes,* a Ponzi scheme case, a court appointed a receiver for Michael Douglas, the perpetrator of the scheme, and the three corporations he used for its implementation. The receiver, *much like a trustee in bankruptcy,* brought suits to recover assets that had originated with the sales of "shares" to the victims, and which had then been siphoned out of the corporations. One question was whether the receiver had standing under the Illinois law of fraudulent conveyances to sue to recover additional assets from certain parties. This court concluded that he could bring the suit, even though at one point the corporations were themselves wrongdoers. Once Douglas had been ousted from control and the receiver had been appointed, "[t]he corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes."

The Trustee contends that the Pennsylvania Supreme Court would follow the rationale of the Ninth Circuit and conclude that equitable defenses based on a corporate officer's or principal's misconduct are not available in a suit against a bankruptcy trustee. As support for this contention, the Trustee asserts that "[b]oth California and Pennsylvania follow the well-settled maxim that 'equity seeks to do equity.'" Trustee's Supp.Mem. at 6 (*citing Greenan v. Ernst*, 393 Pa. 321, 143 A.2d 32 (1958)). The Trustee further contends that "[l]ike California, Pennsylvania courts routinely exercise their equitable powers to bar the use of equitable defenses where the result would be harm to innocent third parties, such as creditors." Trustee's Supp.Mem. at 7. As authority for this statement, the Trustee cites *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968), and *In re Francis Edward McGillick Foundation*, 406 Pa.Super. 249, 594 A.2d 322 (1991), *rev'd in part on other grounds*, 537 Pa. 194, 642 A.2d 467 (1994). I agree that the former case sheds light on how the Pennsylvania Supreme Court would rule on the availability of the imputation defense against the Trustee.[27] Universal Builders entered into a construction contract with the defendant. After completing construction, Universal filed suit seeking equitable relief and money damages. Thereafter, Universal went into bankruptcy and the trustee proceeded with the suit. Relying on the equitable doctrine of unclean hands, the defendant argued that the plaintiff should be denied relief because during the performance of the contract, one of Universal Builder's officers had allegedly manufactured evidence to support the case. The Pennsylvania Supreme Court disagreed, reasoning that even if the officer's conduct could be imputed to Universal, the decision to apply the doctrine was discretionary. In concluding that under the circumstances of the case, the doctrine should not be applied, the court stated:

> Where the rights of innocent parties are involved, the doctrine should be applied cautiously ... and the doctrine should not be invoked if its application will produce an inequitable result. To deny plaintiff recovery in this case would result in the enrichment of Moon at the expense of innocent creditors of the bankrupt Universal. This is an inequitable result and thus we are not per-

---

*Id.* at 754. The trustee here reasons that he stands in the same position as the Scholes receiver: Lake States may have been a wrongdoer at one time, but now that the trustee is in control, he should be able to pursue claims against the other wrongdoers for the benefit of the entire class of creditors.

> *Although the trustee's Scholes argument is convincing on the inapplicability of the in pari delicto doctrine here,* he overlooks a crucial difference between Scholes and the present case. For purposes of determining whether a suit must be brought by the trustee on behalf of the creditor class as a whole or may be brought by an individual creditor, the claims available to the trustee are not the same as those the Apostolou Plaintiffs are trying to bring....

*Id.* at 879 (emphasis added).

**27.** While supportive of the general proposition espoused by the Trustee, I find the *McGillick Foundation* case too factually disparate to be very helpful here. In *McGillick Foundation, supra,* the Roman Catholic Diocese of Pittsburgh ("Diocese") filed a petition seeking to have the trustees of the Francis Edward McGillick Foundation ("Foundation") removed from their positions for improper conduct. The trustees raised the doctrine of unclean hands in an effort to bar the petition. The trustees claimed that the Diocese misappropriated disbursements from the Foundation that were intended for scholarship recipients. While acknowledging the maxim that "one who seeks equitable relief must appear before the court with clean hands" and agreeing that the record supported a finding that the Diocese had acted improperly, the superior court refused to apply the doctrine of unclean hands to bar the Diocese's petition. 406 Pa.Super. at 262, 594 A.2d at 329. The superior court explained that "[u]nclean hands will not be invoked where its application will produce inequitable results, especially where the rights of innocent parties are involved" and that, in this case, application of the doctrine would "lead to an inequitable result adversely affecting the rights of potential scholarship recipients[.]" *Id.*

suaded that the clean hands doctrine should be applied.

430 Pa. at 555, 244 A.2d at 14.

In support of its contention that the Pennsylvania Supreme Court would rule that the imputation defense is applicable in suits by a bankruptcy trustee, Grant Thornton cites to several Pennsylvania cases recognizing that as a general rule a receiver of an insolvent corporation "stands in the same position as the corporation" and, as such, "the defendant may take advantage of any defense that might have been made if the suit had been brought by the corporation prior to its insolvency." *Schmidt v. Paul*, 377 Pa. 377, 382, 105 A.2d 118, 120–21 (1954) (defense of payment allowed). *See also Lyons v. Benney*, 230 Pa. 117, 119, 79 A. 250, 251 (1911) (defense of fraud not allowed); [28] *Barclay v. Edlis Barber Supply Co.*, 39 Pa.Super. 482, 485 (1909) (defense of set-off allowed). In further support of its position that the Pennsylvania courts would permit the imputation doctrine to be raised in suits by bankruptcy trustees, Grant Thornton asserts that "Pennsylvania cases creating a right of imputation *have not sought to limit* the categories of plaintiffs against whom the imputation defense may be raised." Grant Thornton's Reply at 12. As authority for this proposition, Grant Thornton cites the following three cases: *Todd v. Skelly*, 384 Pa. 423, 120 A.2d 906 (1956); *Solomon v. Gibson*, 419 Pa.Super. 284, 615 A.2d 367 (1992); and *Cover v. Cushing Capital Corp.*, 344 Pa.Super. 593, 497 A.2d 249 (1985). However, in all three of these cases, the courts ruled that imputation was not applicable. Given the holdings in these three cases, they do not support the proposition for which Grant Thornton has cited them. Moreover, none of Grant Thornton's cases provide any insight into the Pennsylvania courts' view of allowing the imposition of an equitable defense against a trustee.

The refusal of Pennsylvania's highest court in *Universal Builders* to allow the invocation of the equitable defense of unclean hands against a bankruptcy trustee when its application would produce an inequitable result (*i.e.*, application of the defense would result in harm to inno-

28. While cited for Grant Thornton's proposition, the Supreme Court found an exception to the rule in this case, stating:

> While the general rule is undoubtedly that the receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself, and a defendant in a suit brought by him may take advantage of any defense that might have been made before its insolvency, *it is equally true that when an act has been done in fraud of the rights of the creditors of an insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid against the corporation itself. In such a case, he may maintain an action which the corporation itself could not.*

230 Pa. at 119–20, 79 A. at 251 (emphasis added). In *Lyons*, the receiver of a bank brought suit to enforce a note against its maker. The maker sought to defend against the suit on the grounds that he signed the note only to accommodate the bank; that the bank understood that he was not to be personally liable on the note; and that the purpose of the note was to deceive the bank examiner into believing that the bank had a valuable note when it did not. The Pennsylvania Supreme Court ruled that this defense could not be raised against the bank's receiver. In so holding, the court reasoned that the receiver represented not only the bank, but also its creditors who were also victims of the bank's fraud and that since the maker of the note "was a party to the scheme of the officers of the bank to enable them to make a deceptive and fraudulent showing of assets, and as the fraud was perpetrated upon the creditors, now represented by the bank's receiver, [the receiver could] maintain an action on the note for their benefit." *Id.* at 120, 79 A. at 251. To the extent the Pennsylvania Supreme Court based its ruling on the receiver's assertion of creditor claims, the force of the decision is undercut by the subsequent decision of the United States Supreme Court in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), regarding a trustee's standing to sue. Read broadly, it suggests a willingness on behalf of the court in certain circumstances to deviate from the aforementioned general rule that a defendant may raise the same defenses against a receiver for an insolvent company that he would be able to raise against the company itself.

cent third parties) convinces me that there are circumstances when the trustee's position as plaintiff is different from that of the corporation, even when bringing the corporation's claim. Accordingly, while the true and oft stated maxim that a trustee standing in the shoes of the corporation takes no greater rights than the debtor is certainly the beginning of my analysis, my inquiry does not end there. I perceive that under Pennsylvania law equitable defenses such as the doctrine of imputation that may be sustainable against the corporation may fail to act as a total bar to recovery when the beneficiaries of the action are the corporation's innocent creditors, but I also recognize that the beneficiaries will not always be limited to innocent creditors. Rather, the equities in suits by bankruptcy trustees will vary. In one bankruptcy case, the creditors may be innocent third parties; in another case, the wrongdoing principals of the debtor may hold the vast majority of claims against the estate. In the latter case, invocation of equitable defenses may produce the most equitable results because, even though the defendant may have been negligent, it would be inequitable to allow the wrongdoers to benefit from their fraudulent conduct. Therefore, I conclude that Pennsylvania's Supreme Court would reject the notion that equitable defenses can never be raised against a trustee plaintiff but rather would allow a court applying Pennsylvania law discretion to bar use of the defense when under the circumstances presented, it concludes that its invocation would produce an inequitable result.

■ This distinction between imputation when the plaintiff is the corporation and imputation when the plaintiff is the trustee for the corporation does not, as Grant Thornton argues, implicate the Trustee's standing. I do not find any incompatibility between the fact that creditors are the intended beneficiaries of this suit and that the Trustee's standing is based on his right to assert claims of the corporation.

Accordingly, I reject Grant Thornton's contention that this action was brought against Grant Thornton on behalf of the Debtor's creditors and not on behalf of the Debtor. Grant Thornton's Reply at 2. If that were the case Grant Thornton would be correct that: (i) the Trustee would lack standing to bring this action pursuant to the rule enunciated in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), namely that a trustee lacks standing generally to sue third parties on behalf of the creditors of the estate; and (ii) the action would violate the law in Pennsylvania that an action for accountants' negligence cannot be maintained unless there is privity of contract between the parties. *See* Grant Thornton's Mem. at 37; Grant Thornton's Reply at 6–7, 9–12. Rejecting the hypothesis, I find these well established rules of law inapplicable here.

The Trustee's assertion that this action will benefit creditors is not an admission that this action is being brought on their behalf. In a liquidation case, it is commonplace for a trustee to pursue an action on behalf of the debtor in order to obtain a recovery thereon for the estate. If the trustee is successful in the action, the recovery which he obtains becomes property of the estate and is then distributed pursuant to the scheme established by § 726(a). Simply because the creditors of a estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors. Otherwise, whenever a lawsuit constituted property of an estate which has insufficient funds to pay all creditors, the lawsuit would be worthless since under *Caplin* it could not be pursued by the trustee. *See Gordon v. Basroon (In re Plaza Mortgage and Finance Corporation, supra)*, 187 B.R. at 42 ("To find that the trustee has no standing to pursue causes of action belonging to the debtor because the recovery would only benefit the creditors is an absurd argument, given the fact that the trustee's goal is to make a distribution to creditors."). Such a result would be non-

sensical. It would provide a windfall to the defendant without any justifiable reason.

In the instant case, the Trustee alleged in the Amended Complaint that Grant Thornton's conduct caused Debtor to suffer damages in the nature of "lost profits." As I reasoned in *Waslow I*, 212 B.R. at 82 n. 5, such damages belong solely to the Debtor and not to its creditors. Similarly, in the Trustee's expert report, damages are calculated based on the decrease in value of the Debtor's business. Again, a creditor could not sue for this type of damage. Accordingly, based on the injury claimed and the types of damages being sought, I reiterate my prior finding in *Waslow I* that this lawsuit is not being brought on behalf of the creditors. *See Drabkin v. L & L Construction Associates, Inc. (In re Latin Investment Corp.)*, 168 B.R. 1, 6 (Bankr.D.Dist.Col.1993) (reasoning that to the extent the bankruptcy trustee's allegations of fraud "are made in the hope of recovering for any damages defendants may have caused depositors, ... the trustee is without standing to sue[,]" but to the extent the allegations "relate to how defendants and the debtor's principals acted in concert to loot the debtor, the trustee has standing to seek redress for any damages the debtor suffered from this fraudulent scheme."). *See also McHale v. Huff (In re Huff)*, 109 B.R. 506 (Bankr.S.D.Fla.1989). In short, I find no inconsistency between the Trustee's pursuit of the corporation's claim for the alleged harm caused to it by Grant Thornton's conduct and the fact that the beneficiaries of his action are the corporation's creditors.

> 2. *Whether the Imputation Defense is Inapplicable Under the Facts of this Case in Light of the Objectives Of Tort Liability to be Served*

In *Waslow I*, I observed that auditor liability cases do not fit squarely within the traditional law on imputation. I based this conclusion on my observations regarding the origins and public policy served by the law of imputation:

> The imputation theory grew out of actions, most frequently brought by financial institutions, to recover on obligations that were created through the fraudulent acts of their agents. Notably, in these cases, the plaintiff was seeking to recover from an innocent party. The policy reason for imputing the knowledge of the wrongdoer to the plaintiff employer was explained by the Pennsylvania Supreme Court:
>
>> Where one of two innocent persons must suffer by the fraud or negligence of a third, whichever of the two has accredited him, ought to bear the loss.
>
> *Gordon v. Continental Casualty* [319 Pa. 555, 565, 181 A. 574, 577 (1935)].

212 B.R. at 90. Unlike traditional imputation cases, in auditor liability cases the plaintiff is not seeking to retain the benefit of a fraudulent transaction and the defendant is not an innocent party.[29] Thus,

---

**29.** While some courts have carried the concept of the innocent third party into auditor liability cases, others allow use of the imputation defense unless the defendant has colluded with the corporation's wrongful agent. *Compare Federal Deposit Insurance Corporation v. O'Melveny & Meyers, supra*, 969 F.2d at 751 & n. 8 (concluding that defendant law firm was not entitled to invoke estoppel defense of imputation because it was not an innocent third party), *Comeau v. Rupp*, 810 F.Supp. 1127, 1142 (D.Kan.1992) (reasoning there was no inequity in withdrawing the imputation defense from the auditor defendant's "litigation arsenal" because "this is not a case where a wholly innocent party will be called upon to pay for a loss caused by another"), and *Merin v. Yegen Holdings Corp. (In re Liquidation of Integrity Insurance Company)*, 240 N.J.Super. 480, 506, 573 A.2d 928, 941–42 (1990) (accountant's culpability would estop it from raising defense of imputation since the "rule of implied notice is invocable to protect the innocent and never to promote an injustice.") *with Federal Deposit Insurance Corporation v. Shrader & York*, 991 F.2d 216, 226 (5th Cir.1993) (where record contained no evidence that defendant law firm colluded with corporations' wrongful agent, court rejected FDIC's argument that, because the de-

while the imputation doctrine may be applied in auditor liability cases, the doctrine was not crafted with that purpose in mind.

■ The application of the imputation defense in auditor liability cases has received its most comprehensive analysis by the Seventh Circuit Court of Appeals in two oft referenced decisions, *i.e., Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982) and *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983). In *Waslow I,* I concluded that what *Cenco* and its progeny add to the traditional jurisprudence of imputation is "an express recognition, implicit in the earlier imputation cases, that the objectives of tort liability are the touchstone" by which a court should decide whether to invoke the doctrine in the context of a suit against a corporation's professional advisors. 212 B.R. at 90. I believe that utilization of the *Cenco* analysis to determine whether a defendant in an auditor liability case should be permitted to invoke the imputation doctrine to bar recovery is consistent with the viewpoint expressed by the Pennsylvania Supreme Court in *Universal Builders, supra,* that defendants should be permitted to invoke equitable defenses only when their application would produce an equitable result.

Limiting those situations in which the imputation doctrine can be invoked in auditor liability cases to circumstances in which its application would serve the objectives of tort liability would ensure that the doctrine would be used only when it would produce an equitable result. Accordingly, I conclude that, if confronted with the issue, the Pennsylvania Supreme Court would adopt the *Cenco* analysis in auditor liability cases and allow imputation to be invoked only where the objectives of tort liability dictate. *See Phar–Mor, Inc. v. Coopers & Lybrand (In re Phar–Mor, Inc. Securities Litigation), supra,* 900 F.Supp. at 786–87 & n. 3 (W.D.Pa.1995) (after noting that state law of Pennsylvania or New Jersey controls with no significant difference between the two, the court applied the tort liability analysis of *Cenco* to determine whether wrongdoing of Phar–Mor's officers and employees should be imputed to company). *See also Welt v. Sirmans,* 3 F.Supp.2d at 1401–03 (finding no Florida case law on whether imputation defense could be raised against a bankruptcy trustee, district court concluded that Florida would apply two-pronged tort analysis of *Cenco* and permit trustee "to bring a claim for damages stemming from a third party's negligent failure to discover a fraud perpetrated by such corporation's officers and directors.").

fendant law firm was not an innocent party, it was not entitled to raise the imputation defense), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994). In *Shrader & York, supra,* the FDIC sued a law firm alleging that it negligently contributed to the failure of two of its clients, City Savings & Loan Association ("City") and Lamar Savings Association ("Lamar"), by failing to alert the directors of City and Lamar that the transactions were illegal. *Id.* at 218. In its defense, the law firm sought to impute the knowledge of a wrongdoing director/shareholder of the savings and loans to the FDIC. As one of its arguments, the FDIC claimed that the law firm was not entitled to the benefit of the general rule of imputation because it was not an innocent party and had a duty to protect City and Lamar from the director/shareholder's conduct. *Id.* at 226. The Fifth Circuit rejected this argument, stating:

Application of such an exception would require a showing that [the law firm] colluded with [the director/shareholder] to defraud City and Lamar. *See e.g., Crisp v. Southwest Bancshares Leasing Co.,* 586 S.W.2d 610, 615 (Tex.Civ.App.1979) ("The [imputation] rule is for the protection of innocent third parties and does not protect those who collude with the agent to defraud the principal.").... The FDIC has not alleged or produced summary judgment evidence that [the law firm] colluded with [the director/shareholder], or that it did so to defraud City and Lamar. It has only alleged that [the law firm] performed its duties negligently. This argument therefore has no merit.

991 F.2d at 226. There is no allegation that Grant Thornton in any way colluded with Fred.

In *Cenco,* the company's top managerial employees who also owned stock in the company engaged in massive fraud aimed at inflating the company's inventories far above their actual value. As a result of the fraud, the price of the company's stock was greatly increased and the company was able to "borrow money at lower rates than if its inventories had been honestly stated[.]" 686 F.2d at 451. In addition, the company recovered excess amounts from its insurers since the company's claims for lost or destroyed inventory were based on "inflated rather than actual inventory values." *Id.* After the company's corrupt management was replaced, the company filed claims against its auditors for, *inter alia,* breach of contract, negligence and fraud, alleging that the auditors failed to prevent fraud by Cenco's managers. A jury trial was held and judgment was entered in favor of the auditors. On appeal, Cenco argued that the judge improperly "instructed the jury that the acts of a corporation's employees are the acts of the corporation itself if the employees were acting on the corporation's behalf." *Id.* at 453–54. In addressing this contention, the Seventh Circuit posed the following general question: "in what circumstances, if any, [is] fraud by the corporate employees a defense in a suit by the corporation against its auditors for failure to prevent the fraud." *Id.* at 454. Based on Illinois precedent, the Seventh Circuit rejected the extreme position that an employee's fraud is always attributable to the corporation. The Seventh Circuit also reasoned that while auditors are "not detectives hired to ferret out fraud. . . . if they chance on signs of fraud they may not avert their eyes—they must investigate." *Id.* Yet, this did not "tell" the Seventh Circuit "what the result should be if the fraud permeates the top management of the company and if, moreover, the managers are not stealing from the company— that is, from its current stockholders—but instead are turning the company into an engine of theft against outsiders—creditors, prospective stockholders, insurers,

etc." *Id.* In predicting how the Illinois courts would decide this issue, the Seventh Circuit assumed the courts "would be guided by the underlying objectives of tort liability," namely compensating the victims of wrongdoing and deterring wrongdoing. *Id.* at 455. In *Waslow I,* summarized the Seventh Circuit's analysis of whether these objectives would be met by a judgment against the auditors, stating:

> Analyzing the first stated objective, the Seventh Circuit reasoned that a judgment in favor of Cenco would "be perverse from the standpoint of compensating victims of wrongdoing" since the real beneficiaries of such a judgment would be Cenco's shareholders among which were the "corrupt officers themselves." *Id.* at 455. With regard to the issue of deterrence, the appellate court opined that while liability against Cenco's auditor would make it and firms like it more diligent in the future, allowing the owners of the corrupt company to shift the costs of its wrongdoing to its auditor would reduce their incentives to hire honest managers and monitor their behavior. *Id.* at 455–56. On this point, the Seventh Circuit reasoned as follows:

> > [N]ot only were some of Cenco's owners dishonest but the honest owners, and their delegates—a board of directors on which dishonesty and carelessness were well represented—were slipshod in their oversight and so share responsibility for the fraud that [the auditor] failed to detect. In addition, the scale of the fraud—the number and high rank of the managers involved—both complicated the task of discovery for Seidman and makes the failure of oversight by Cenco's shareholders and board of directors hard to condone.

> *Id.* at 456.

*Waslow I,* 212 B.R. at 87–88. Based on its analysis, the Seventh Circuit concluded that the objectives of tort liability would be served by preventing Cenco from shifting

the entire responsibility for its wrongdoing to its auditors.

Only one year after its decision in *Cenco,* the Seventh Circuit decided *Schacht v. Brown, supra.* The facts in *Schacht* are the following:

> [T]he plaintiff was the Illinois Director of Insurance (the "Liquidator"), acting as the statutory liquidator for, Reserve Insurance Company ("Reserve"). The Liquidator sued Reserve's auditors for issuing unqualified financial statements when they knew that the company was insolvent. When the statements were issued, the company's officers and directors were engaged in fraud to keep the company in business. As a result of their fraud, the company became saddled with additional liabilities and was driven deeper into insolvency.

*Waslow I,* 212 B.R. at 88. On appeal, the auditors argued, *inter alia,* that, based on *Cenco,* the Liquidator was estopped from suing them since he admitted that Reserve's officers and directors instigated the illegal conduct. The Seventh Circuit disagreed finding that *Cenco* was inapplicable to the estoppel issue before it. The Seventh Circuit reasoned that whereas *Cenco* was decided under Illinois state law, the facts before it involved federal law. *Schacht,* 711 F.2d at 1347.[30] Moreover, whereas the fraud at issue in *Cenco* benefitted the company "to the detriment of outside creditors, stock purchasers and insurers," *id.,* the fraudulent conduct of Reserve's officers and directors "aggravated Reserve's insolvency," *id.* at 1348.

However, most significantly, the court further reasoned that, even if the "Cenco-type analysis" were applied, the Liquidator would not be estopped from bringing his claims since a recovery by him on behalf of Reserve would in this case serve the dual objectives of tort law. *Id.* at 1348. With regard to the objective of compensating the victims of wrongdoing, the Seventh Circuit stated:

> [A]ny recovery by the [Liquidator] from the instant suit will inure to Reserve's estate. And under the distribution provisions of the governing liquidation statute, it is the policyholders and creditors who have first claim (after administrative costs and wages owed) to the assets of the estate. Ill.Rev.Stat., ch. 73 § 817 (1981). Thus, the claims of these entirely innocent parties must be satisfied in full before Reserve's shareholders, last in line for recovery, receive anything.

> Moreover, there is no indication here that the [Liquidator's] success entails the likelihood of the kind of "perverse" compensation pattern which we declined to permit in *Cenco.* In *Cenco,* the court was troubled by the fact that among the shareholders benefitting from a successful recovery were the corrupt managers themselves . . .; here, the defendants do not claim that the wrongdoing officers or directors hold equity positions in Reserve entitling them to recover from the instant suit.

*Id.* As for the second objective, deterring wrongdoing, the Seventh Circuit explained that its refusal in *Cenco* to permit the company to recover "unimpeded by the directors' knowledge" was based on two factors: "(1) that the directors, as shareholders, would recover directly from the suit; and (2) that there existed large corporate shareholders in a position to police Cenco's corrupt officers, an activity which would be discouraged by allowing the shifting of corruption-caused loss to outside defendants.'" *Id.* at 1349. The Seventh Circuit reasoned that, in contrast, in the case before it neither of these factors were present:

> [T]here is no evidence that the wrongdoing officers of Reserve would benefit directly from the instant suit. There is also no evidence here of the existence of large corporate shareholders capable of conducting an independent audit . . . and whose lack of investigatory zeal would

---

**30.** *Schacht* preceded the Supreme Court's decision in *O'Melveny.*

be rewarded by a decision favorable to the [Liquidator].

*Id.* at 1347–48. Significantly, the court further declared that "unlike the situation in *Cenco,* permitting recovery in this case would not send unqualified signals to shareholders that they need not be alert to managerial fraud since they may later recover full indemnification for that fraud from third party participants." *Id.* Based on this rationale, the Seventh Circuit declared that even if *Cenco* was applicable, "application of its compensation and deterrent principles would not inhibit the right of the [Liquidator] to proceed against the defendants." *Schacht,* 711 F.2d at 1349.

Since Pennsylvania's appellate courts have never applied the imputation doctrine in an auditor liability case, they have never been called upon to undertake an analysis of the relationship between the objectives of tort liability and the use of the imputation defense against a trustee or a receiver. Indeed the only Pennsylvania case to do so, *Phar–Mor, Inc. v. Coopers & Lybrand (In re Phar–Mor, Inc. Securities Litigation),* 900 F.Supp. 784 (W.D.Pa.1995) ("*Phar–Mor II*"),[31] emanates from the federal district court.[32] While it makes no

---

**31.** An earlier and related decision by the same court rejected the imputation defense for the same reasons set forth in *Phar–Mor II. See Giant Eagle of Delaware, Inc. v. Coopers & Lybrand (In re Phar–Mor, Inc. Securities Litigation),* 892 F.Supp. 676, 683–84 (W.D.Pa. 1995).

**32.** Based on my research, there are three other federal cases from Pennsylvania districts involving auditor malpractice claims wherein the district court's applied Pennsylvania's imputation principles. *See Official Committee of Unsecured Creditors v. Shapiro (In re Walnut Leasing Company, Inc.),* 1999 WL 729267 (E.D.Pa. Sept. 8, 1999); *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corporation,* 899 F.Supp. 1399 (W.D.Pa.1994); *Begier v. Price Waterhouse,* 135 B.R. 222 (E.D.Pa.1991). Only in the most recent case, *Shapiro, supra,* did the court conclude that the principal shareholders' wrongdoing could be imputed to bar a suit by the bankruptcy trustee. In this case, the court found the imputation doctrine applicable in a suit brought by the *Official Committee of Creditors* on behalf of the bankrupt debtors against an accounting firm and concluded based on the pleadings that the sole shareholder and his brother, an officer, owned and controlled the corporations so that the "sole actor exception" to the adverse interest exception of the imputation doctrine required their conduct to be imputed. Moreover, since it was pled that the debtors, acting through these individuals, perpetrated a Ponzi scheme with the assistance of the accountants, the doctrine of *in pari delecto* was found to bar plaintiff's suit for claims arising out of the fraud. In so holding, the court relied on *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991), which held that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Id.* at 117. As *Wagoner* turns on the trustee's standing to sue, it is not clear to me how its principles are applicable given the Court's recognition that deepening insolvency is a cognizable injury to corporate debtors apart from harm to the investors. While a bankruptcy court is not bound to follow a decision of single district court judge, *Threadgill v. Armstrong World Industries, Inc.,* 928 F.2d 1366, 1370 (3d Cir.1991) (holding that there is no law of the district), such decision is entitled to deference by this Court. *See In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 106 (Bankr.E.D.Pa.1991). However, as the controlling issue is one of state law as to which the state appellate courts have not spoken and in the absence of consideration of the objectives of tort liability or how the Pennsylvania Supreme Court would rule on the invocation of the imputation defense against a bankruptcy trustee, I am unable to follow the path seemingly charted by the Walnut Court.

In the earlier case of *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corporation, supra,* the court imputed the knowledge of the dual former owners and three top former officers who were involved in a fraudulent scheme to the corporation and thus found no reliance could be established by the plaintiff. Significantly, while the district court's decision in this case suggests that the claim against Grant Thornton was filed by a receiver on behalf of HMC, the court treats and refers to the plaintiff as HMC and does not discuss the role of the receiver. Thus, the court never addressed the issue of whether the imputation defense could be raised against HMC's receiver. In *Begier v. Price Waterhouse, supra,* the court ruled in favor of the accounting firm, concluding, based on the doctrine of imputation, that the corporation had knowledge of the

mention of whether Pennsylvania would adopt the *Cenco/Schacht* analysis, it utilizes tort policy as the touchstone of its decision. Moreover, as the decision postdates the Supreme Court's decision in *O'Melveny*, it suggests that Pennsylvania law was the governing rule of decision. In *Phar–Mor II*, the corporation, which was in the midst of a reorganization under Chapter 11 of the Bankruptcy Code, sued its auditors for malpractice for failing to detect the fraud perpetrated by several of its officers and employees. The auditors moved for summary judgment contending that the fraud of the officers and employees should be imputed to the company. The district court denied the motion, concluding that there were genuine issues of material fact on whether the actions of the wrongdoers were intended to benefit the company. The district court also reasoned that:

> [U]nder the proposed Reorganization Plan and Disclosure Statement filed by Phar–Mor in the bankruptcy action, Phar–Mor's claims against Coopers will be assigned to a litigation trust established by the plan, and any recovery by Phar–Mor in the case sub judice would inure to the benefit of the secured and unsecured creditors having an interest in the trust. Neither the fraudulent actors nor Phar–Mor's equity holders would benefit from a recovery by Phar–Mor in this action. Thus, the objectives of tort liability, to wit, compensation of victims of wrongdoing and deterrence of future wrongdoing, would arguably be served should Phar–Mor ultimately prevail and recover on its claims.

*Id.* at 787. Having concluded that the two-pronged tort analysis of *Cenco* and *Schacht* provides an analytical framework consistent with the Pennsylvania courts'

prior rulings and finding that in *Phar–Mor*, this approach provided a workable solution to the tension between pure agency principles and the imputation defense that flows from them and the unique circumstances of a liquidation proceeding, I will apply it here.

■ The primary objectives of tort liability in Pennsylvania are compensating the victims of harm and preventing the occurrence of harm in the future by deterring wrongful conduct.[33] *See Commonwealth v. Hicks,* 502 Pa. 344, 348, 466 A.2d 613, 615 (1983) (noting that "it has long been perceived that the imposition of liability for negligent conduct tends to improve the quality of social conduct"), *appeal dismissed,* 465 U.S. 1015, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984); *Mason v. Western Pennsylvania Hospital,* 499 Pa. 484, 496–97, 453 A.2d 974, 981 (1982) (Larsen, J., concurring and dissenting) (objectives of tort liability are compensation of victim, deterring future negligence and not discouraging desirable activity); *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 599, 305 A.2d 877, 884 (1973) (courts are concerned with compensation of victim and admonition of wrongdoer); *McCormick v. Northeastern Bank of Pennsylvania,* 391 Pa.Super. 7, 569 A.2d 971 (1990) (*quoting* W. Prosser *et al.,* Prosser and Keaton on the Law of Torts 6–25 (W. Keeton 5th ed. 1984)) ("The courts are concerned not only with the compensation of the victim, but with admonition of the wrongdoer."), *appeal granted,* 525 Pa. 657, 582 A.2d 324 (1990), *review dismissed,* 527 Pa. 145, 589 A.2d 211 (1991). Accordingly, I will examine whether each of these objectives would be furthered or hindered by allowing the Trustee to proceed with this suit without regard to traditional notions of imputation.

---

information which it claimed the accounting firm failed to disclose. However, the court did not address the issue presented here, namely whether the imputation defense is applicable to trustees, because the parties *agreed* that the trustee stood in the shoes of the corporation and that any defenses applicable

against the corporation applied to him. In neither of the latter two cases does the district court apply *Cenco's* tort analysis.

**33.** In that sense, the law of Pennsylvania is no different than the law of Illinois applicable in *Cenco/Schacht.*

### (a) Deterring Wrongdoing

■ In setting the stage for the parties' arguments on this factor, I find it helpful to review the underpinnings of the Seventh Circuit's decisions in *Cenco* and *Schacht* on whether the objective of deterrence would be served by allowing the lawsuit in each respective case to proceed. In *Cenco*, the Seventh Circuit's decision that a recovery by the company against its auditors would inhibit the tort objective of deterring wrongdoing was motivated, as the Seventh Circuit explained in *Schacht*, by two primary circumstances: (1) the wrongdoers would benefit as shareholders from a recovery in the suit; and (2) allowing the shifting of corruption-caused loss from Cenco to its auditors would discourage large corporate shareholders from policing the company's corrupt officers. *See Schacht, supra,* 711 F.2d at 1349. *See also Cenco, supra,* 686 F.2d at 455–56 ("If the owners of the corrupt enterprise are allowed to shift the costs of its wrongdoing entirely to the auditor, their incentives to hire honest managers and monitor their behavior will be reduced."). In *Schacht,* the Seventh Circuit examined the same two factors, concluding that since neither one of them was present,[34] the objective of deterrence would not be inhibited by allowing the Liquidator's suit to proceed. *Schacht, supra,* 711 F.2d at 1349.

In the instant case, Grant Thornton contends that the deterrence objective would not be served by a recovery here because "officers of a closely held company like Jack Greenberg will be unrestrained in how they report the company's financial condition if they believe that they can always sue the company's auditor to recover money to repay [the] creditors [whom] the officers have cheated." Grant Thornton's Mem. at 38. Based on the evidence in the record, I agree with Grant Thornton's characterization of Debtor as a closely-held corporation. Two individuals controlled the Debtor's business, namely Fred and Emanuel. These same two individuals, with their families, own all of the company's stock. Moreover, these same two individuals, with their mother, comprised the Board of Directors of the company. However, Grant Thornton's argument wholly ignores the fact that Debtor is in bankruptcy and in the process of being liquidated.[35] Assuming that none of the shareholders/officers of Debtor recover here, I fail to see how the motivation of the shareholders or officers in closely-held corporations to accurately report the company's financial condition will be affected by this lawsuit. Rather, the factor that would more likely motivate officers and shareholders of a closely-held corporation like Debtor to adopt procedures that would protect the accuracy of their financial statements would be the prospect of being forced into bankruptcy and having the business liquidated. If such a looming threat does not motivate the officers of a closely-held company to adopt procedures to ferret out fraud, then I highly doubt a recovery which is obtained by a trustee in a Chapter 7 liquidation and which will benefit only the company's creditors would impact on their decision. Thus, I am unpersuaded by Grant Thornton's position that a recovery by the Trustee would thwart the deterrence objective of tort law.

However, there is another reason that imputation would not further the tort objective of deterring wrongdoing in this case by signaling to shareholders that they can ignore managerial fraud. The record in this case suggests that Emmanuel was

---

34. As noted above, *see* discussion *supra* at 510–511, the Seventh Circuit reasoned that there was no evidence that the wrongdoers would benefit from the Liquidator's suit against the company's auditors and there was no evidence of "large corporate shareholders capable of conducting an independent audit ... and whose lack of investigatory zeal would be rewarded" by a decision in the Liquidator's favor. *Schacht, supra,* 711 F.2d at 1349.

35. Significantly, my analysis here is limited by the fact that Debtor is in a Chapter 7 bankruptcy rather than in a Chapter 11 reorganization.

concerned with the manner in which Fred was running the prepaid inventory portion of the business and that Emmanuel attempted to persuade Fred to adopt procedures which would have ferreted out his fraud but that Fred refused to do so. Emanuel Deposition at 87. Thus, the facts here are unlike the situation addressed in *Cenco* where "not only were some of the owners dishonest but the honest owners—a board of directors on which dishonesty and carelessness were well represented—were slipshod in their oversight." 686 F.2d at 456. As emphasized in *Schacht*, it was the failure of large corporate shareholders capable of conducting an independent audit whose lack of investigatory zeal would be rewarded by a shifting of the loss to the auditors. Given Fred's equal ownership in the company and his apparent control, not only is there is no evidence that Emmanuel was "slipshod," there is no evidence that he could have prevented Fred's wrongful acts. Rather in the unique circumstances where a corporation is owned and operated by family members, the goal of deterring wrongdoing is best served by subjecting the auditors to potential liability, thereby encouraging greater diligence by them in such situations in the future.

As for the Trustee's position on this issue, he asserts that since it is the creditors and not the shareholders who will benefit from any recovery in this matter, " 'unlike the situation in *Cenco*, permitting recovery in this case would not send unqualified signals to shareholders that they need not be alert to managerial fraud since they may later recover full indemnification for that fraud from third party participation.' " Trustee's Mem. at 19 (*quoting*

*Schacht*, 711 F.2d at 1349). Integral to the Trustee's position is his contention that none of the shareholders will benefit from a recovery in this matter. I turn to that question next.

### (b) Compensating the Victims

The Trustee, referring to the distribution scheme under Code § 726(a), argues that it will be the creditors, the actual victims of the wrongdoing, and not the shareholders, who will benefit from a recovery in this matter since they must be paid before any property is distributed to the Debtor. Trustee's Mem. at 19. Grant Thornton, on the other hand, contends that since the Trustee is bringing this action on behalf of the Debtor which is owned by Fred and Emanuel, in essence, "this is a suit brought by a Trustee standing in the shoes of the shareholders of the Company." [36] Grant Thornton's Mem. at 37. As a result, Grant Thornton concludes, "Fred Greenberg and Emanuel Greenberg stand to gain if any recovery is made against Grant Thornton." *Id.* Grant Thornton offers no explanation as to how Fred and Emanuel "stand to gain" if there is a recovery against it. Simply because they are shareholders does not mean that they will be the recipients of a recovery by the Trustee. *Schacht, supra,* 711 F.2d at 1348; *Phar–Mor II, supra,* 900 F.Supp. at 787; *Drabkin v. L & L Construction Associates, Inc. (In re Latin Investment Corporation), supra,* 168 B.R. at 6. Rather I agree with the Trustee that resolution of this question is controlled by the distribution scheme for liquidation cases set forth in 11 U.S.C. § 726(a), that property of the estate is distributed to the debtor only after creditors have been paid. Thus,

---

**36.** This is not a correct statement of law. The Trustee stands in the shoes of the Debtor corporation. Where a corporation is insolvent or in the vicinity of insolvency, corporate law requires its management to consider as paramount the interests of its creditors. 3A Fletcher Cyclopedia of the Law of Private Corporations § 1035.60 (perm. ed. rev. vol. 1994, 1998 cum. suppl.) ("When a corporation becomes insolvent, the duties of the di-

rectors and officers shift from maximizing profits for the shareholders to preserving the corporation's assets as a 'trust fund' for the creditors.") *See also Blatstein v. Blatstein (In re Main, Inc.),* 1999 WL 424296, at *13 (E.D.Pa. June 23, 1999) (noting that Pennsylvania courts have held that directors of an insolvent corporation hold their powers "in trust" for the corporation's creditors.)

Fred and Emanuel only stand to gain if the recovery is large enough to pay prior claims in the distributive scheme. Not surprisingly, Grant Thornton has offered no evidence to prove that the possible judgment will be so large as to satisfy all claims and leave an excess for equity holders. The only evidence on the potential beneficiaries of this litigation was submitted by the Trustee.[37]

In support of his position, the Trustee attached as Exhibit B to his affidavit a Settlement Stipulation to which he and the shareholders, *inter alia*, are parties which provides that "the shareholders, including Fred Greenberg, shall release any and all *claims* against the Debtor's estate." *Id.* at ¶ 16 (emphasis added). Given this evidence, I can conclude on this record that Fred will not participate as a *creditor* in a distribution of any litigation recovery, and that all creditors will be paid in full and with interest under § 726(a)(5)[38] before any funds would flow to the Debtor for distribution to shareholders. However, whether Fred will benefit from a recovery as a shareholder is another question. Shareholders, as noted above, only stand to benefit under the statutory distribution scheme if there are excess funds in the estate after all creditors have been paid. Needless to say, to the extent the shareholders have released their interests in the Debtor or waived any distribution on account of their interests, they would not benefit from the litigation and the tort policy of compensating victims would be furthered by allowing the suit to proceed.

The Trustee appears to read release of "claims" as including a release of any right to payment on account of an equity interest. Examination of the underlying agreement wherein the shareholders have memorialized their agreement reveals a broad release, including "any and all actions, causes of action, setoffs, demands, proceedings, agreements, contracts, judgments, damages, accounts, reckonings, executions, claims and liabilities whatsoever...." Absent is the word "interests." Thus, I cannot be certain whether the shareholders would claim an interest in a recovery from Grant Thornton after all creditors are paid. Presumably the Trustee understands the global agreement that the parties reached to negate that right.[39]

However, there is other evidence presented by the Trustee to demonstrate that the shareholders will not benefit from this litigation. The Trustee points to his affidavit showing that as of June 30, 1999, the estate had $1,075,000 in cash-on-hand and but for an additional $3,100 from collection of a receivable, that sum is the only source of payment to creditors other than the litigation proceeds. Waslow Affidavit ¶¶ 3, 4. The Trustee's affidavit also states that the following claims would have to be paid before any distribution would be made to the Debtor under § 726(a)(6): as of June 30, 1999(1) unbilled professional fees of $373,033.05; (2) priority claims of $212,349.10; (3) estimated unsecured claims of $3,051,708.47; (4) an additional $225,000 due to the banks; (5) costs incurred by

---

37. In response to my questioning of the parties at the hearing concerning the identity of any evidence to support either parties' conclusion as to the beneficiaries of the lawsuit, the Trustee filed an affidavit of his own to support his assertion that the creditors and not Fred will benefit from any recovery obtained. *See* Affidavit of Larry Waslow ("Waslow Affidavit"), Exhibit A to Trustee's Supp. Mem. While Grant Thornton did not submit any supplemental evidence, it did not object to the Trustee's late filed evidence, which was referred to at the hearing. I therefore deem any procedural objection to its consideration waived.

38. Section 726(a)(5) requires "payment of interest at the legal rate from the date of filing of the petition on any claim paid under paragraph (1), (2), (3) or (4) of this subsection." This section ensures that creditors will receive interest on their claims before any distribution is made back to the debtor.

39. The silence in the Settlement Agreement may reflect the fact that during the negotiations, no one focused on the possibility that there could be equity available for shareholders after the creditors' claims are paid by reason of a large litigation recovery.

litigation counsel of $13,265.35; and (6) $60,082.85 on account of late filed claims pursuant to § 726(a)(3). *Id.* ¶ 5, 6, 8, 9, 11, 12. Additionally the Trustee's statutory commission,[40] continuing professional fees of the Trustee's counsel and accountants as well as the continuing costs of this litigation would be paid prior to any distribution to the Debtor. From this data, the Trustee concludes there would be no excess funds for shareholders. Since the Trustee did not attempt to analyze these numbers to demonstrate the validity of his position, I will attempt to do so below.

The total amount of claims as of June 30, 1999 plus the Trustee's commission is $4,056,000. Additionally, holders of claims are entitled to receive interest at the legal rate from the petition date before the trustee may distribute any funds to the debtor. 11 U.S.C. § 726(a)(5).[41] By Order dated November 4, 1996, the retention of the Trustee's special litigation counsel was approved allowing counsel a 30% contingent fee for its services. *Id.* ¶ 6. Thus, it appears that the ultimate judgment would have to be at least $6,021,700 [42] plus the

amount incurred for continuing accruing administrative expenses, including the costs for trial, before the net recovery would be sufficient to pay the claims of creditors in full. With this information, I can approximate the size of a judgment that would have to be secured before funds would flow to the corporation for distribution to shareholders, including the wrongdoer, Fred, provided they have not waived their right to receive the same.

Recognizing that the ultimate recovery cannot be known until the judgment is rendered, I am left with the Trustee's view of the potential damage claim as articulated by his expert. The Trustee has made part of this record, albeit for other purposes, his Expert's Report, to which I referred in footnote 14 above. In that Report, Santarelli opines that, as a result of Grant Thornton's conduct, the Debtor suffered economic damages ranging from $3,372,275 to $6,237,681 depending on the year negligence would be found.[43] *See* Trustee's Mem., Trustee's Expert Report, Exhibit G at 20.[44] Based on these num-

---

40. The Trustee has not quantified this amount. Assuming the rate of 3% was awarded (*i.e.*, for recoveries over $1,000,000) on the distribution to creditors, the Trustee would be entitled to compensation of approximately $120,000 based on the $3,936,000 (without regard to interest) of claims to be paid. 11 U.S.C. § 326(a).

41. The Trustee has also failed to quantify this obligation. In *In re Chiapetta*, 159 B.R. 152, 160–61 (Bankr.E.D.Pa.1993), the court ruled that the "legal rate of interest" to be awarded under § 726(a)(5) is the "federal judgment rate in effect at the time of the bankruptcy filing[.]" According to my research, the federal judgment rate in effect at the time of the Debtor's bankruptcy filing was 6.28%. Assuming then that the legal interest rate is 6.28% and the period from the filing of the petition on May 19, 1995 to the actual distribution to creditors is five years, that would require an additional distribution to creditors of approximately $1,237,160 (*i.e.*, 6.28% times $3.94 million times five). Moreover, to the extent this litigation is further protracted by the trial calendar or appeal(s), the distribution to creditors could extend beyond the five year anniversary, making the interest payment under § 726(a)(5) even higher.

42. Without regard to the contingent fee, the net recovery must conservatively exceed $4,215,160 ($5,293,160 less $1,078,000) before any funds would flow to shareholders through the corporation. Since 30% is reserved for counsel, the ultimate judgment must be increased proportionately before creditors will be paid in full.

43. Santarelli estimates the damages as follows:

| Fiscal year | Damages |
| --- | --- |
| 1990 | $6,237,681 |
| 1991 | $5,785,711 |
| 1992 | $4,713,212 |
| 1993 | $3,572,765 |

Trustee's Mem., Trustee's Expert Report, Exhibit G at 20.

44. Santorelli's report also provides an alternate calculation including interest on the damage calculation. That calculation ranges from $4,580,558 to $10,240,173. He makes no reference in his report to any basis for an award of interest and neither of the parties has suggested any. I am unaware of any basis for an award of interest in this case. While prejudgment interest is awarded as a matter of right in contract claims, *Fina v.*

bers, even accepting the Trustee's damage claim,[45] I find the possibility that shareholders will recover are extremely slim to none.[46] Consequently, I am not concerned that allowing this litigation to proceed on its merits would allow a wrongdoer to benefit contrary to the objective of tort liability that only victims be compensated.

Thus, it is apparent that not only are the beneficiaries of a recovery against Grant Thornton the creditors who are innocent victims of the harms visited upon the corporation, but that the shareholders, including Fred, the wrongdoer, will not enjoy

any fruits of this lawsuit. *Schacht*, 711 F.2d at 1348.[47] The second objective of tort liability, *i.e.*, compensating the victim, would thus be furthered if the Trustee is allowed to pursue his action.

### (c) Result of *Cenco* analysis

Applying the record before me to the legal authorities described above, I find that refusing to allow Grant Thornton to invoke the imputation defense against the Trustee serves both objectives of tort liability. As noted above, I believe that the Pennsylvania Supreme Court would allow

*Fina*, 737 A.2d 760 (Pa.Super.1999), the Trustee's breach of contract claim was dismissed in response to Grant Thornton's motion to dismiss. Furthermore, pre-judgment interest in the form of delay damages under Pa.R.C.P. 238 are only awarded in actions "seeking monetary relief for bodily injury, death or property damage." Pa.R.C.P. 238. *See Willet v. Pennsylvania Medical Catastrophe Loss Fund*, 549 Pa. 613, 622 n. 7, 702 A.2d 850, 854 n. 7 (1997).; *Sun Pipe Line Company v. Tri–State Telecommunications, Inc.*, 440 Pa.Super. 47, 62, 655 A.2d 112, 119 (1994). Since the damages being sought in this case are for accounting malpractice, Pennsylvania case law indicates that Rule 238 delay damages are not applicable. *See Rizzo v. Haines*, 357 Pa.Super. 57, 65, 515 A.2d 321, 325 (1986) (concluding that Rule 238 does not apply to a legal malpractice action). *See also Wagner v. Orie & Zivic*, 431 Pa.Super. 337, 341 n. 2, 636 A.2d 679, 681 n. 2 (1994) ("[T]o extend delay damages to legal malpractice cases would be to override the purpose of Rule 238, which is to encourage defendants in personal injury actions to offer realistic settlement amounts."). Even under Pennsylvania common law, interest would not be recoverable since the damages in this matter are not fixed with any degree of certainty. *See Marrazzo v. Scranton Nehi Bottling Company*, 438 Pa. 72, 74–75, 263 A.2d 336, 337 (1970) (under Pennsylvania common law, interest may be awarded by the jury in cases of unliquidated damages where "the compensation can be measured by market value or other definite standard"); *Braig v. Pennsylvania State Employes' Retirement Board*, 682 A.2d 881, 886–87 (Commw.Ct.1996) (under Pennsylvania common law, interest may be imposed in the absence of any express contract if: (i) the debt was liquidated with some degree of certainty; and (ii) the duty to pay it became fixed.).

**45.** Not surprisingly, Grant Thornton's expert Ernest L. Ten Eyck takes a dim view of San-

tarelli's damages opinion. Finding the basis for his numbers anything but clear, a view I share, Van Eyck notes that the damage calculation appears to be based on the decreased business value for each period that the material mistatement of Debtor's financial statement was not uncovered by Grant Thornton. He challenges not only the measurement of decreased value but the premise that had Grant Thornton stated the inventory at its true value, subsequent losses would have been prevented. *See* Appendix to reply Brief in Support of Grant Thornton's Motion for Summary Judgment, Exhibit N, Report of Ernest L. Ten Eyck at 39–41.

**46.** Even supposing damages in the amount of Santarelli's highest damage estimate ($6,237,-681) were awarded, which while a possibility seems remote, the difference between this number and the recovery needed to pay the claims of creditors in full, not including continuing accruing administrative expenses such as the costs of trial, is $215,981 ($6,237,-681 – $6,021,700). If Santarelli's next highest damage estimate ($5,785,711) is used, *see supra* n. 43, the estate would have insufficient funds to pay creditors in full.

**47.** Distinguishing *Cenco*, the Seventh Circuit's findings in *Schacht* are instructive here:

First, any recovery by the Director from the instant suit will inure to Reserve's estate. And under the distribution provisions of the governing liquidation statute, it is the policyholders and creditors who have first claim (after administrative costs and wages owed) to the assets of the estate, [citation omitted]. Thus, the claims of these entirely innocent parties must be satisfied in full before Reserve's shareholders, last in line for recovery, receive anything.

711 F.2d at 1348.

a trustee to prosecute a lawsuit against a corporation's auditors without being subject to the invocation of the imputation doctrine to prevent the occurrence of an inequitable result. As such, the Trustee should be accorded insulation from the equitable defense of imputation that could be raised against the Debtor. Significantly, while the equities may weigh against allowing Grant Thornton to invoke the imputation defense, the Trustee must still prove that the auditor's conduct caused its damages in order to recover. *See In re Sunrise Securities Litigation*, 818 F.Supp. 830, 843 (E.D.Pa.1993) (prohibiting defendant from raising imputation defense to FDIC's suit does not lessen FDIC's burden at trial to prove that its losses were caused by defendant's wrongful conduct); *Comeau v. Rupp*, 810 F.Supp. 1127, 1142 (D.Kan.1992) ("refusing to impute to the FDIC the conduct and knowledge of [the failed savings and loan's] managers does not lessen plaintiff's burden to prove that its losses were caused by the Accountant's wrongful conduct."). That will be the province of the jury since I decline to grant summary judgment in favor of Grant Thornton on Counts II, III and IV.

### B. *Contributory Negligence*

Grant Thornton also contends that the Trustee's claims are barred because the Debtor was contributorily negligent. According to Grant Thornton, the company was negligent in: (i) failing to institute adequate safeguards to prevent Fred's defalcations; and (ii) failing to discover Fred's manipulations of inventory. Grant Thornton's Mem. at 38–39.

▮ Under Pennsylvania law, the contributory negligence of a plaintiff in an auditor malpractice case is a defense only when it contributed to the auditor's failure to perform the contract and report the truth. *Waslow I, supra*, 212 B.R. at 92 (*quoting Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa.Super. 536, 551, 542 A.2d 72, 80 (1988), *appeal denied*, 524

Pa. 608, 569 A.2d 1367 (1989)). In adopting this rule, sometimes called the "audit interference" rule, *see National Credit Union Administration Board v. Aho, Henshue & Hall*, 1991 WL 174671, at *3 (E.D.La.1991); *Scioto Memorial Hospital Association v. Price Waterhouse*, 74 Ohio St.3d 474, 476, 659 N.E.2d 1268, 1272 (1996) the Pennsylvania Superior Court relied upon the principles espoused in *National Surety Corp. v. Lybrand*, 256 App. Div. 226, 9 N.Y.S.2d 554 (1939), wherein the court stated:

> We are ... not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently ... Accountants, as we know, are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible. Accordingly, we see no reason to hold that the accountant is not liable to his employer in such cases. Negligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and report the truth. Thus, by way of illustration, if it were found that the members of [the employing firm] had been negligent in connection with the transfer of funds which occurred at about the time of each audit and that such negligence contributed to the defendants' false reports it would be a defense to an action for it could then be said that the defendants' failure to perform their contract was attributable, in part at least, to the negligent conduct of the firm.

256 App.Div. at 235–36, 9 N.Y.S.2d at 563. Under this standard, the defense of contributory negligence does not apply unless: (1) the plaintiff was negligent; and (2) the negligence contributed to the defendant's failure to perform his contract and report the truth.[48] *Id. See Federal Deposit Insur-*

---

48. Grant Thornton asserts that since the comparative negligence statute does not apply in this case, if the Debtor is found to be just one percent (1%) negligent, the Trustee's two

*ance Corporation v. Deloitte & Touche,* 834 F.Supp. 1129, 1144 (E.D.Ark.1992) ("The National Surety rule does not bar the assertion of a contributory negligence defense but merely limits its scope. States following National Surety allow accountants to blame their clients, but only for conduct that contributes to the accountants' mistakes, as opposed to conduct that may have directly caused the clients' losses."); *Comeau v. Rupp,* 810 F.Supp. 1172, 1181–82 (D.Kan.1992) (referring to rule espoused in *National Surety Corp. v. Lybrand, supra,* as a modified form of contributory negligence).

■ Grant Thornton provides the following examples of Debtor's negligence: Emanuel Greenberg refused to require his brother to relinquish control over prepaid inventory accounting matters to permit Steve Cohn to start tracking the transactions as he wanted to do and as Grant Thornton recommended. Moreover, despite knowing that there were issues with prepaid inventory, Emanuel Greenberg never checked or verified his brother's work in matching up the delivery receipts with the other prepaid inventory documentation.[49] In addition, the Company failed to improve its internal controls by: (i) using a personal computer to track all prepaid inventory payments and receipts and a control sheet; and (ii) retaining additional documentation supporting each prepaid inventory transaction and preparing an inventory log to be maintained by the Company's controller.[50]

Grant Thornton's Mem. at 41. Even if I agreed that the Debtor was negligent in these respects, such negligence would not bar the Trustee's claims unless I also concluded, as a matter of law, that the Debtor's negligence contributed to Grant Thornton's failure to perform its contract and report the truth. I cannot make such a ruling on this record.

■ Debtor has submitted evidence which could support a finding that Grant Thornton acted negligently in the years relevant hereto by not requiring Debtor to produce, in conjunction with each of Grant Thornton's audits, the USDA forms applicable to each of its shipments of prepaid inventory. Had these forms been utilized by Grant Thornton to cross-check the arrival dates of Debtor's prepaid inventory, then regardless of Debtor's negligence, Grant Thornton would have discovered Fred's fraud. Based on such evidence, a reasonable trier of fact could conclude that Grant Thornton's negligence caused Debt-

---

claims for negligence and negligent misrepresentation are barred by the principle of contributory negligence. Grant Thornton's Mem. at 40–41. While I agree that the comparative negligence statute does not apply in this case, *Rizzo v. Michener,* 401 Pa.Super. 47, 53–54, 584 A.2d 973, 976 (1990) ("The Pennsylvania Comparative Negligence Act only applies to negligence resulting in death or injuries to persons or damage to property. There must be a tortious episode which causes damage to tangible real or personal property."), *appeal denied,* 528 Pa. 613, 596 A.2d 159 (1991); *Wescoat v. Northwest Savings Association,* 378 Pa.Super. 295, 300, 548 A.2d 619, 621–22 (1988) (Pennsylvania's comparative negligence statute does not apply to all actions for negligence, but only those resulting in death or injury to person and property; the statutes does not apply to pocketbook losses), the defense of contributory negligence has been limited in the context of audit malpractice cases. Under the law of Pennsylvania, as explained above, the contributory negligence of a plaintiff in an accounting malpractice is a defense only when it contributed to the defendant's failure to perform its contract and report the truth.

49. While there is evidence in the record that Emanuel was not satisfied with the manner in which Fred was operating the Debtor's prepaid inventory business, I am unaware of any evidence indicating that Emanuel had any suspicion that there was a discrepancy in the arrival dates of Debtor's shipments of prepaid inventory. Accordingly, Emanuel had no reason to check or verify his brother's work in matching up the delivery receipts with the other prepaid inventory documentation.

50. Significantly, Grant Thornton recommended that Debtor retain additional documentation for the prepaid inventory and maintain an inventory log for such inventory *only after* its audit in 1993.

or's losses and that Debtor's negligence, if it even was negligent, did not contribute to Grant Thornton's failure to report the truth. Under Pennsylvania law, "[c]ontributory negligence should not be declared as a matter of law unless the record inescapably leads to that conclusion; otherwise, the question is reserved for determination by the jury." *Solomon v. Baum,* 126 Pa.Commw. 646, 650, 560 A.2d 878, 880 (1989), *appeal denied,* 525 Pa. 636, 578 A.2d 930 (1990). *See also PNC Bank of Kentucky, Inc. v. Housing Mortgage Corp.,* 899 F.Supp. 1399, 1409 (W.D.Pa. 1994) (concluding that the analysis for audit interference under *Jewelcor Jewelers and Distributors, Inc. v. Corr, supra,* "involves numerous issues of fact, including whether any contributory negligence was substantial enough to relieve the defendant of liability"). Since the record does not "inescapably" lead to the conclusion that Debtor was contributorily negligent, summary judgment on this issue cannot be granted.[51]

### C. *The Trustee's Claims of Fraud and Aiding and Abetting Fraud*

Counts III and IV of the Amended Complaint contain claims for fraud, and aiding and abetting fraud, respectively. Grant Thornton contends that the fraud claim in Count III should be dismissed because the Trustee has failed to present clear and convincing evidence of the elements of fraud. With respect to Count IV, Grant Thornton argues that it should be dismissed because aiding and abetting fraud is not recognized as a cause of action under Pennsylvania common law. Each of these arguments is addressed below.

#### 1. *Count III—Fraud*

In order to prove a claim for fraud, a plaintiff must establish the elements of fraud by clear and convincing evidence. *Royal Indemnity Company v. Deli By Foodarama, Inc.,* 1999 WL 178543, at * 7 (E.D.Pa. March 31, 1999); *Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 67, 563 A.2d 1182, 1187 (1989), *appeal denied,* 524 Pa. 629, 574 A.2d 70 (1990). The elements are: (1) a misrepresentation; (2) made with knowledge of its falsity or recklessness as to whether it is true or false; (3) an intent by the maker that the recipient be induced to rely on the misrepresentation; (4) justifiable reliance by the recipient; and (5) damage to the recipient. *First Capital Corporation v. Country Fruit, Inc.,* 19 F.Supp.2d 397, 401 (E.D.Pa.1998) (*citing Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994)); *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983); *Krause v. Great Lakes Holdings, Inc., supra,* 387

---

**51.** Grant Thornton also asserts that the Trustee's claims are barred by the Debtor's contributory negligence because Fred's "conduct constituted deliberate interference with Grant Thornton's audits and was the proximate cause of the Company's losses." Grant Thornton's Mem. at 39, 41–43. Grant Thornton contends that application of this theory does not require the imputation of Fred's conduct to the Debtor. *See id.* at 39. However, Grant Thornton has failed to explain its position in this regard. In addition, the case which Grant Thornton cites in support of its position, namely *First American Mortgage Company, Inc. v. Sacks (In re Stratton),* 99 B.R. 686, 692–95 (D.Md.), *aff'd,* 900 F.2d 255 (1990), while stating otherwise, appears to be premised on imputation of the wrongdoers conduct to the corporation. In the aforementioned case, the district court concluded that it did not have to decide the issue of imputa-

tion because the wrongdoer was in "substantial control of the affairs of the corporation" (which seems to be an application of the sole actor exception to the imputation rule). 99 B.R. at 694. Rather, the district court held that the negligent acts of the wrongdoers were chargeable to the company under the theory of respondent superior, reasoning that the wrongdoers were acting within the scope of their employment and in furtherance of the company's business when they committed the negligent acts in question which, significantly, is the same test applied under Pennsylvania law for imputation. 99 B.R. at 694–95. *See Waslow I, supra,* 212 B.R. at 83–84 (under Pennsylvania law, the fraud of a corporate officer is imputed to the corporation when the officer's fraudulent conduct was in the course of his employment and for the benefit of the corporation).

Pa.Super. at 67, 563 A.2d at 1187. Fraud is proven when "it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false." *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. at 108, 464 A.2d at 1252. In order to defeat a defendant's motion for summary judgment, a plaintiff must come forward with evidence which could lead a jury to find clear and convincing proof of fraud. *Fisher v. Aetna Life Insurance & Annuity Company*, 39 F.Supp.2d 508, 511–12 (M.D.Pa.1998).

■ Based on the allegations in the Amended Complaint, the bases of the Trustee's fraud claim in Count III appear to be threefold. The Trustee alleges that Grant Thornton committed fraud by: (i) concealing a bank overdraft by making adjustments to Debtor's books and records and failing to disclose the aggregate lending cap set by the banks; (ii) adjusting the Debtor's journal entries to eliminate a negative balance caused by Debtor's practice of holding checks; and (iii) misrepresenting that the Debtor's financial statements were accurate even though the prepaid inventory balances were overstated. *See* Amended Complaint ¶¶ 37–52. *See also* Trustee's Mem. at 36–38;[52] Grant Thornton's Mem. at 44–49.

Having reviewed the evidence in the record, I conclude that to the extent the Trustee's fraud is based on Grant Thornton's alleged concealment of the Debtor's bank overdraft and the adjustments which it made to Debtor's journal entries in or-der to eliminate the negative cash balance that resulted from Debtor's practice of holding checks, the claim cannot withstand summary judgment. The evidence reveals that Emanuel, Fred and Cohn were all aware of the Debtor's aggregate borrowing limits, and that both Emanuel (on a daily basis) and Cohn (on a monthly basis) were aware of the aggregate amount of Debtor's borrowings. Accordingly, the Trustee cannot prove that the Debtor justifiably relied upon Grant Thornton's representations regarding the amount of credit which Debtor had available to it and Grant Thornton's alleged concealment of the Debtor's bank overdraft situation. Furthermore, the record reflects that Emanuel was aware that: (i) checks were being issued and held by Debtor; and (ii) Grant Thornton was making adjustments to Debtor's books and records in order to reclassify the checks back to accounts payable and cash (so that the books and records would accurately reflect what had and had not been paid). Therefore, the Trustee cannot prove that Debtor was unaware that its financial statements had been adjusted to account for the checks which it was holding.

■ As for the remaining aspect of the Trustee's fraud claim, Grant Thornton contends that the Trustee has failed to present clear and convincing evidence that it committed fraud by representing that the Debtor's prepaid account balances were accurate. Grant Thornton's Mem. at 48. While I agree with this proposition as to Grant Thornton's conduct prior to 1993,[53] I

---

**52.** According to the Trustee, the adjustments which Grant Thornton made to Debtor's journal entries to conceal the negative balance created by its practice of holding checks was part of Grant Thornton's effort to conceal the Debtor's bank overdraft. *See* Trustee's Mem. at 41–42 ("[T]here is no question that Grant Thornton knew that the lines of credit were exceeded resulting in a bank overdraft and that the overdraft was concealed on the financial statements through Grant Thornton's affirmative journal entries which reclassified checks which were issued and outstanding but not yet presented back to accounts payable and cash.").

**53.** While I agree with Grant Thornton's position as to its conduct prior to 1993, I find its discussion of the evidence in support of its position unpersuasive. Grant Thornton argues as follows:

Fred Greenberg's fraud went undetected by everyone until it as uncovered by Grant Thornton's auditors during the 1994 audit. Even Steve Cohn, the Company's controller, a person with a degree in accounting and a certified public accountant, who

find that there is evidence in the record which could lead a jury to conclude that Grant Thornton committed fraud in issuing its unqualified opinion of Debtor's financial statements in 1993.

Viewing the evidence in the light most favorable to the Trustee,[54] the evidence reveals that Grant Thornton incorrectly believed that the same operations and controls applied to Debtor's prepaid inventory business and its domestic meat business and that, as a result, Grant Thornton misunderstood Debtor's operations as they pertained to its prepaid inventory busi-

---

once worked at Coopers & Lybrand and a self-described "accounting and inventory specialist" was fooled. App.Ex. B at 6–10. There is no evidence, let alone clear and convincing evidence that any Grant Thornton auditor either knew, or had reason to know, of the fraud prior to its discovery during the 1994 audit. Furthermore, there is no evidence that Grant Thornton acted recklessly. To the contrary, the evidence shows that Grant Thornton was aware of the significance of prepaid inventory balances, tested each and every prepaid inventory transaction every year, and made suggestions on how the Company could improve its accounting for this asset.
Trustee's Mem. at 48–49. Whether Cohn discovered Fred's fraud is irrelevant to whether Grant Thornton acted recklessly in not discovering it. Cohn could not insist that Fred implement tighter controls over the prepaid inventory, but Grant Thornton, as Debtor's auditor, could. Indeed, that is how the fraud was finally discovered in 1994—Grant Thornton refused to issue an unqualified opinion on Debtor's financial statements unless the USDA Form 9540–1's were produced. Moreover, if Cohn had had the ability to insist that Fred implement his suggestions for keeping track of prepaid inventory, Cohn would have, in all likelihood, discovered the fraud since he came close to doing so when he tried to implement the suggestions on his own. Also, the fact that Grant Thornton tested 100% of the prepaid inventory does little to further Grant Thornton's cause since, in doing the testing, it was relying on the receiving date which Fred manufactured and not utilizing any third party document to verify the same. The issue is whether Grant Thornton acted recklessly, in conscious disregard for the truth, in relying solely upon the internally generated Delivery Receipt to verify the arrival date of Debtor's prepaid inventory.

54. The Trustee summarizes the evidence supporting its claim that Grant Thornton committed fraud by misrepresenting that the Debtor's financial statements were accurate even though the prepaid inventory balances were overstated, stating:

[I]n 1993 Grant Thornton analyzed the receiving date on the Steer documents and compared it to the receiving date on the internal receiving slip. This analysis revealed a two month difference between the time the goods were arriving at the port in Philadelphia and the Debtor's warehouse. In addition, during the course of the 1993 audit and before the opinion was issued, Grant Thornton had in its possession hundreds of USDA documents which conclusively showed that the receiving date on the internal receiving slip was incorrect. Despite the fact that Grant Thornton knew that there was a two month lag between the arrival of goods in Philadelphia and the arrival of good in the warehouse according the receiving slip [sic] and that Grant Thornton had in its possession the very documents which would during the next audit prove that the receiving dates were doctored, Grant Thornton issued an unqualified opinion.
***

Finally, had Grant Thornton taken a step back and looked at prepaid inventory as a percentage of sales for the period 1990 through 1993, it would have discovered that the prepaid inventory grew substantially while during [the] period of 1986 through 1994, inventory (other than prepaid) remained at a relatively constant level between 5.4% and 6.7% of sales. . . . In 1994, once the misstatement in the Prepaid Inventory account was corrected, the level of Prepaid Inventory to sales fell to substantially the same level.
In addition, it is probative to note that after the 1993 audit, Grant Thornton finally determined that it required independent third party confirmation of the receiving date and insisted that it receive copies of the USDA inspection reports. The USDA inspection report was required as "additional audit evidence to support the claims being made by management." When the USDA inspection reports were not provided to Grant Thornton at the beginning of the 1994 audit, David Burns told the Debtor that Grant Thornton "may treat this as a limitation on the scope of our audit" and, as a result, Grant Thornton would consider modifying its opinion or resigning for [sic] the account because of the failure to provide the requested documents.
Trustee's Mem. at 36–38.

ness. Based on this misunderstanding, Grant Thornton concluded that Debtor's internal procedures for its prepaid inventory business included a "segregation of duties" and, therefore, that it could rely upon the Debtor's internally generated Delivery Receipt as evidence of when shipments of prepaid inventory had arrived at the Debtor's warehouse. According to the Trustee's Expert Report, Grant Thornton should have performed a walk-through to test its understanding of the prepaid inventory portion of Debtor's business. Had such a walk-through been performed, Santarelli opines that Grant Thornton would have realized that the prepaid inventory business did not utilize a segregation of duties and that third party documentation existed to verify the arrival dates of the inventory. While this evidence could support a finding of negligence against Grant Thornton, it does not constitute "clear and convincing evidence" that Grant Thornton acted recklessly with a disregard for the truth.

The record also establishes that, during its 1993 audit, Grant Thornton noticed that the time periods between the arrival dates on the forms which Debtor's custom broker, John Steer, prepared when a shipment of prepaid inventory arrived in the United States and the arrival dates on the Delivery Receipts at Debtor's warehouse were getting longer. When Grant Thornton questioned Fred on this issue, he provided an explanation for the delay. Grant Thornton verified the explanation by contacting John Steer. *See* Barker Dep. at 88. Viewed in isolation, this effort by Grant Thornton to analyze the time period between arrival dates and, thereafter, to verify Fred's explanation for why the time period between them was getting longer shows a concern for the truth and not a reckless disregard for it.

However, the record further reveals that Grant Thornton was aware as early as 1988 of the existence of the USDA Form 9540–1 which it could have utilized to veri-

fy the arrival date of shipments of prepaid inventory. While Grant Thornton was originally unaware that Debtor had access to these forms, near the end of its audit in 1993 Grant Thornton discovered a drawer full of them in Debtor's warehouse. An attempt was made to match the forms with the Delivery Receipts so that the dates listed thereon could be verified, but it proved too difficult to do; the forms were too numerous and unorganized. Grant Thornton made no attempt to obtain organized copies of these documents. According to Grant Thornton, although it now knew that third party verification of the delivery dates existed, it considered it unnecessary to have the USDA forms for the 1993 audit because of its reliance on Debtor's segregation of duties. Yet, Grant Thornton refused to rely upon the Debtor's segregation of duties for its 1994 audit. Rather, it demanded that Debtor produce the USDA forms for the 1994. When Fred failed to comply with this demand, Grant Thornton advised him that without the forms, it would not issue an unqualified opinion or would resign from its audit. I believe this evidence could lead a trier of fact to conclude that Grant Thornton acted recklessly in issuing its unqualified opinion in 1993. If Grant Thornton would not issue an unqualified opinion in 1994 relying solely upon the Debtor's segregation of duties, then why did it do so in 1993?

The Trustee's claim in Count III of the Amended Complaint shall survive summary judgment to the extent it is based on Grant Thornton's representation in 1993 that Debtor's financial statements were accurate even though the prepaid inventory balances were overstated. The other bases of the claim are dismissed.

### 2. *Count V—Aiding and Abetting Fraud*

■ As noted above, Grant Thornton contends that Pennsylvania does not recognize an action for aiding and abetting fraud. Decisions from the district court

support this contention.[55] *See Klein v. Boyd,* 1996 WL 675554, at *33 (E.D.Pa. Nov. 19, 1996) ("[T]he Pennsylvania Supreme Court has never recognized a cause of action for aiding and abetting common law fraud."), *aff'd in part and rev'd in part,* 1998 WL 55245 (3d Cir.1998), *rehearing en banc granted and judgment vacated,* (March 9, 1998); *S. Kane & Son Profit Sharing Trust v. Marine Midland Bank,* 1996 WL 325894, at * 9 (E.D.Pa. June 13, 1996) (granting summary judgment on claim for aiding and abetting since "Pennsylvania has not adopted this cause of action."). Rather than directly addressing this argument, the Trustee lists the elements of a cause of action for aiding and abetting and cites two cases, namely *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 791 (3d Cir.1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983), and *Kranzdorf v. Green,* 582 F.Supp. 335, 337 (E.D.Pa.1983), in support thereof. Significantly, in *Walck v. American Stock Exchange, Inc., supra,* the Third Circuit listed the elements for holding a party secondarily liable for "aiding and abetting a securities violation" and not aiding and abetting common law fraud. *Walck, supra,* 687 F.2d at 790–91. The district court in *Kranzdorf v. Green, supra,* relied upon *Walck* in identifying the elements of aiding and abetting fraud without recognizing this distinction. Since the Trustee has provided no meritorious argument in opposition to Grant Thornton's contention that summary judgment should

be granted on Count V, Grant Thornton is entitled to the relief requested.

### III. SUMMARY

The Motion shall be granted in part and denied in part. Summary judgment shall be granted on Count V of the Amended Complaint, but denied on Counts II, III and IV.

---

**55.** In *Cenco, supra,* the trial court entered a directed verdict in favor of the auditor and against the plaintiff company on its claim for aiding & abetting fraud. On appeal, the Seventh Circuit affirmed the trial court's ruling on this count, reasoning, in pertinent part: [W]e can easily dispose of the charge that [the auditor] aided and abetted the fraud by Cenco's managers. *There is no tort of aiding and abetting under Illinois law or, so far as we know, the law of any other state;* all the cases that Cenco has cited with regard to this count are criminal cases. This is not a gap in tort law. Anyone who would be guilty in a criminal proceeding of aiding and abetting a fraud would be liable under tort law as a participant in the fraud, since aider-abettor liability requires participation in the criminal venture. The only utility of a separate tort of aiding and abetting in the commission of a tort would be to give plaintiffs' lawyers one more charge to fling at the jury in the hope that if enough charges are made the jury may accept at least one. In any event, creating a new Illinois tort is something for the Illinois courts or legislature to do rather than the federal courts. 686 F.2d at 452–53 (citation omitted) (emphasis added).